# 23-900

IN THE

# United States Court of Appeals for the Second Circuit

LARRY THOMPSON

*Plaintiff-Appellant,*

v.

CITY OF NEW YORK, POLICE OFFICER PAGIEL CLARK, SHIELD # 28472, POLICE OFFICER PAUL MONTEFUSCO, SHIELD # 10580, POLICE OFFICER GERARD BOUWMANS, SHIELD # 2102, POLICE OFFICER PHILLIP ROMANO, SHIELD # 6295,

*Defendants-Appellees,*

POLICE OFFICER WARREN RODNEY, SHIELD # 13744, SERGEANT ANTHONY BERTRAM, SHIELD # 277, POLICE OFFICERS JOHN AND JANE DOES 1-10,

*Defendants.*

On Appeal from the United States District Court for the
Eastern District of New York, No. 14−CV−7349

**BRIEF & SPECIAL APPENDIX OF
PLAINTIFF-APPELLANT LARRY THOMPSON**

David A. Zelman
LAW OFFICE OF DAVID
  A. ZELMAN
709 Eastern Parkway
Brooklyn, N.Y. 11213
(718) 210-6490

Cary London
SHULMAN & HILL
One State Street Plaza
15th Floor
New York, N.Y. 10004
(212) 203-1090

Amir Ali
Gregory Cui
George Mills*
RODERICK & SOLANGE
  MACARTHUR JUSTICE CENTER
501 H Street NE, Ste. 275
Washington, D.C. 20002
(202) 869-3434
gregory.cui@macarthurjustice.org

*Admitted only in California and practicing under the supervision of attorneys who are
admitted in the District of Columbia.*

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 4

ISSUES PRESENTED ....................................................................... 4

STATEMENT OF THE CASE ............................................................. 4

I.   Factual Background ................................................................... 6

    A.   On January 15, 2014, Larry Thompson's Sister-In-Law Mistook Diaper Rash On Mr. Thompson's Daughter For Signs Of Child Abuse And Called 9-1-1 ................................................................... 6

    B.   When Officer Clark And Several Other Officers Arrived, Mr. Thompson Opened His Door And Asked To See A Warrant. .............. 7

    C.   Without Warning Mr. Thompson That He Could Be Arrested If He Did Not Let The Police Enter, The Officers Grabbed Him And Took Him To The Ground ................................................................ 9

    D.   After The Officers Confirmed They Had Been Mistaken, Officer Clark Made False Allegations To Charge Mr. Thompson With Two Crimes. ....................................................................... 10

II.  Procedural History ................................................................... 13

STANDARD OF REVIEW ............................................................... 17

SUMMARY OF ARGUMENT ......................................................... 18

ARGUMENT ................................................................................... 23

I.   The District Court Erred By Assuming That Officer Clark Necessarily Had Probable Cause To Prosecute Mr. Thompson For Obstruction If The Police Had A Lawful Basis To Enter His Apartment. ............... 23

    A.   Citizens Are Entitled To Rely On The Fourth Amendment's Presumption That The Police Must Have A Warrant To Enter The Home. ......................................................................... 24

i

B.     Mr. Thompson Did Not Commit A Crime By Standing In His Doorway And Asking For A Warrant. ................................................. 29

     1.     *Mr. Thompson Did Not Physically Interfere With An Official Function By Peacefully Invoking His Fourth Amendment Rights.* .................................................... 29

     2.     *Mr. Thompson Never Intended To Interfere With Any Official Function.* ....................................................... 34

C.     The District Court's Analysis Of The Resisting Arrest Charge Fails Because Neither Charge Was Supported By Probable Cause. ................................................................................ 36

II.     Qualified Immunity Should Be Denied. ....................................... 36

    A.     Officer Clark Waived The Defense Of Qualified Immunity. ............. 37

    B.     Officer Clark's Defense Fails On The Merits. ................................... 41

     1.     *No Reasonable Officer Would Falsify The Contents Of A Criminal Complaint To Charge Someone With A Crime.* ........ 41

     2.     *Officer Clark Lacked Arguable Probable Cause To Prosecute Mr. Thompson For Obstruction.* ............................. 45

CONCLUSION ....................................................................................... 49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

SPECIAL APPENDIX

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baxter v. Bracey*,
140 S. Ct. 1862 (2020)........................................................44

*Boyd v. City of New York*,
336 F.3d 72 (2d Cir. 2003) ..............................................41

*Bumper v. North Carolina*,
391 U.S. 543 (1968)..........................................................28

*Camara v. Mun. Ct. of City & Cnty. of San Francisco*,
387 U.S. 523 (1967)....................................................26, 28

*Catanzaro v. Weiden*,
140 F.3d 91 (2d Cir. 1998) ..............................................42

*Coggins v. Buonora*,
776 F.3d 108 (2d Cir. 2015) ......................................22, 43

*Conte v. Cnty. of Naussau*,
596 F. App'x 1 (2d Cir. 2014) .........................................38

*Devilla v. Schriver*,
245 F.3d 192 (2d Cir. 2001) ............................................24

*Dufort v. City of New York*,
874 F.3d 338 (2d Cir. 2017) ............................................41

*Ekukpe v. Santiago*,
823 F. App'x 25 (2d Cir. 2020) .......................................30

*Escalera v. Lunn*,
361 F.3d 737 (2d Cir. 2004) ......................................42, 45

*Florida v. Jardines*,
569 U.S. 1 (2013)..............................................................24

*Frost v. N.Y. City Police Dep't*,
　980 F.3d 231 (2d Cir. 2020) .......................................................44, 45

*Gasho v. United States*,
　39 F.3d 1420 (9th Cir. 1994) ..............................................................28

*Gem Fin. Serv., Inc. v. City of New York*,
　298 F. Supp. 3d 464 (E.D.N.Y. 2018) ................................................47

*Georgia v. Randolph*,
　547 U.S. 103 (2006).............................................................................46

*Golino v. City of New Haven*,
　950 F.2d 864 (2d Cir. 1991) ........................................................41, 42

*Greer v. City of Highland Park*,
　884 F.3d 310 (6th Cir. 2018) ..............................................................28

*Groh v. Ramirez*,
　540 U.S. 551 (2004).............................................................................25

*Hampton v. Oktibbeha Cnty. Sheriff Dep't*,
　480 F.3d 358 (5th Cir. 2007) ..............................................................42

*Harris v. State*,
　726 S.E.2d 455 (Ga. Ct. App. 2012)...................................................31

*Henderson v. Thieret*,
　859 F.2d 492 (7th Cir. 1988) ..............................................................40

*Hoggard v. Rhodes*,
　141 S. Ct. 2421 (2021).........................................................................44

*Hopkins v. Bonvicino*,
　573 F.3d 752 (9th Cir. 2009) ..............................................................32

*Johnson v. City of New York*,
　No. 05-cv-7519, 2008 WL 4450270 (S.D.N.Y. Sept. 29, 2008).................48, 49

*Johnson v. United States*,
　333 U.S. 10 (1948)...............................................................................25

*Jones v. Parmley*,
   465 F.3d 46 (2d Cir. 2006) ...................................................................17

*Kee v. City of New York*,
   12 F.4th 150 (2d Cir. 2021) ..................................................17, 18, 29

*Kentucky v. King*,
   563 U.S. 452 (2011)........................................................................28, 32

*Kerman v. City of New York*,
   374 F.3d 93 (2d Cir. 2004) .................................................................24

*Kyllo v. United States*,
   533 U.S. 27 (2001)................................................................................24

*Lakeland Enters. of Rhinelander, Inc. v. Chao*,
   402 F.3d 739 (7th Cir. 2005) .............................................................27

*Lennon v. Miller*,
   66 F.3d 416 (2d Cir. 1995) ...........................................................47, 48

*Manganiello v. City of New York*,
   612 F.3d 149 (2d Cir. 2010) ........................................................22, 41

*McCardle v. Haddad*,
   131 F.3d 43 (2d Cir. 1997) ..........................................................21, 37

*Payton v. New York*,
   445 U.S. 573 (1980)..............................................................................46

*Penree by Penree v. City of Utica*,
   694 F. App'x 30 (2d Cir. 2017) ..........................................................45

*People v. Case*,
   365 N.E.2d 872 (N.Y. 1977)...............................................19, 30, 46

*People v. Castro*,
   918 N.Y.S.2d 399 (N.Y. Sup. Ct. 2010)..........................................46

*People v. Gentry*,
   218 A.D.3d 919 (N.Y. App. Div. 2023) ...........................................32

*People v. Goli*,
  934 N.Y.S.2d 782 (N.Y. App. Div. 2011) ............................................................34

*People v. Grullon*,
  862 N.Y.S.2d 810 (N.Y. Crim. Ct. 2005) ...........................................................46

*People v. Maddaus*,
  5 A.D.2d 886 (N.Y. App. Div. 1958) ..................................................................30

*People v. Offen*,
  408 N.Y.S.2d 914 (N.Y. Crim. Ct. 1978) ....................................................*passim*

*People v. Perez*,
  47 A.D.3d 1192 (N.Y. App. Div. 2008) .......................................................33, 47

*People v. Rodriquez*,
  851 N.Y.S.2d 342 (N.Y. Crim. Ct. 2008) .....................................................28, 34

*People v. Williams*,
  847 N.Y.S.2d 898 (N.Y. Crim. Ct. 2007) .....................................................34, 46

*People v. Xochimitl*,
  147 A.D.3d 793 (N.Y. App. Div. 2017) ..............................................................32

*Phillips v. City of New York*,
  775 F.3d 538 (2d Cir. 2015) .........................................................................21, 39

*Posr v. Court Officer Shield No. 207*,
  180 F.3d 409 (2d Cir. 1999) ...............................................................................46

*Provost v. City of Newburgh*,
  262 F.3d 146 (2d Cir. 2001) .........................................................................21, 38

*Reed v. Campbell Cnty.*,
  --- F.4th ---, 2023 WL 5604200 (6th Cir. Aug. 30, 2023) ..................................27

*Ricciuti v. N.Y.C. Transit Auth.*,
  124 F.3d 123 (2d Cir. 1997) ...............................................................................41

*Richardson v. McMahon*,
  No. 22-582, 2023 WL 3102910 (2d Cir. Apr. 27, 2023) ....................................44

*Rogers v. Jarrett*,
    63 F.4th 971 (5th Cir. 2023) ...............................................................44

*Samuels v. Air Transport Local 504*,
    992 F.2d 12 (2d Cir. 1993) .............................................................37, 39

*See v. City of Seattle*, 387 U.S. 541 (1967)......................................25, 28

*Shaheed v. Kroski*,
    833 F. App'x 868 (2d Cir. 2020) ..................................................28, 48

*Soomro v. City of New York*,
    739 F. App'x 51 (2d Cir. 2018) ..........................................................44

*Stansbury v. Wertman*,
    721 F.3d 84 (2d Cir. 2013) .................................................................29

*Swartz v. Insogna*,
    704 F.3d 105 (2d Cir. 2013) ...............................................................13

*Tellier v. Fields*,
    280 F.3d 69 (2d Cir. 2000) .................................................................43

*Thompson v. Clark*,
    --- F. Supp. 3d ---, 2023 WL 3570658 (E.D.N.Y. May 18, 2023) ......................5

*Thompson v. Clark*,
    142 S. Ct. 1332 (2022)..........................................................13, 15, 40

*Tillmon v. Douglas Cnty.*,
    817 F. App'x 586 (10th Cir. 2010)....................................................39

*United States v. Allen*,
    813 F.3d 76 (2d Cir. 2016) .................................................................32

*United States v. Morris*,
    259 F.3d 894 (7th Cir. 2001) .............................................................40

*United States v. Prescott*,
    581 F.2d 1343 (9th Cir. 1978) ......................................................25, 29

*United States v. Simmons*,
    661 F.3d 151 (2d Cir. 2011) ...............................................................25

vii

*Villegas v. Hackett*,
   225 F. App'x 580 (9th Cir. 2007) ........................................................25

*Welsh v. Wisconsin*,
   466 U.S. 740 (1984) ..............................................................................24

*Wyatt v. Cole*,
   504 U.S. 158 (1992) ..............................................................................44

*Zellner v. Summerlin*,
   494 F.3d 344 (2d Cir. 2007) ...............................................................45

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017) ..............................................................................44

**Statutes**

28 U.S.C. § 1291 ...........................................................................................4

28 U.S.C. § 1331 ...........................................................................................4

42 U.S.C. § 1983 ......................................................................................4, 13

N.Y. Crim. Proc. Law § 690.50 ....................................................19, 31, 46

N.Y. Penal Law § 195.05 ...........................................................................30

**Other Authorities**

Transcript of Oral Argument, *Thompson v. Clark*, 142 S. Ct. 1332
   (2022) (No. 20-659) ........................................................................15, 40

# INTRODUCTION

In January 2014, a false 9-1-1 call brought four police officers to Larry Thompson's door in the middle of the night. Mr. Thompson was at home with his wife and newborn daughter, who were safe and sound. But based on an erroneous report of potential child abuse, the police knocked on Mr. Thompson's door and said they needed to enter his home. Mr. Thompson stood in his doorway and peacefully invoked his Fourth Amendment rights, insisting that the police produce a warrant. Without warning Mr. Thompson that he could be arrested, the police entered his home without a warrant, arrested him, and hauled him away in handcuffs to be detained at the police precinct. Mr. Thompson did nothing to resist.

This appeal is not about whether the police acted appropriately that day. This appeal concerns what one of the officers, defendant Pagiel Clark, did the following day, after learning that the 9-1-1 call was wrong and there had been no child abuse. Rather than let Mr. Thompson go, Officer Clark signed a criminal complaint charging Mr. Thompson with two crimes: obstructing governmental administration and resisting arrest. To justify those charges, Officer Clark lied. He swore that the officers had warned Mr. Thompson that he could be arrested if he did not let them enter his home, and that Mr. Thompson refused the officers' orders and resisted arrest by flailing his arms. But as the evidence in this case shows—evidence that, at this stage, must be taken in the light most favorable to Mr. Thompson—those

1

assertions were entirely and knowingly false. Prosecutors had no choice but to drop the charges against Mr. Thompson, and he then brought this civil rights suit under Section 1983, alleging, among other claims, malicious prosecution.

Officer Clark has repeatedly tried to prevent a jury from ever hearing that claim. He first moved for summary judgment, but the district court denied his motion, holding that the evidence could permit a reasonable jury to find that Officer Clark lacked probable cause for both charges. Then, at the close of trial, Officer Clark moved for judgment as a matter of law, claiming that Mr. Thompson could not show that the prosecution had terminated in his favor, as required for his claim. The district court granted that motion and, as a result, the jury only decided Mr. Thompson's other claims, including a claim that the police had unlawfully entered his home. Mr. Thompson appealed the favorable termination issue to the U.S. Supreme Court and prevailed, resulting in the reinstatement of his claim.

Finally, after the passing of the original district court judge, Officer Clark moved the new judge to reconsider the prior denial of summary judgment. The district court permitted reconsideration on the ground that the prior ruling came before the jury's verdict denying Mr. Thompson's unlawful entry claim. That verdict, the district court reasoned, necessarily established that the police had a lawful basis to enter without a warrant, *i.e.*, exigent circumstances. Assuming such an exigency existed, the district court concluded that Officer Clark necessarily had

2

probable cause to charge Mr. Thompson with obstruction because Mr. Thompson stood in his doorway and refused to let the police enter without a warrant.

The district court erred by treating as criminal the most basic assertion of the Fourth Amendment's protection. The Fourth Amendment creates a presumption that the police must have a warrant to enter the home—a presumption upon which ordinary citizens are entitled to rely, even if the police have information they believe justifies a warrantless entry. Contrary to the district court's reasoning, it can simultaneously be true that the police had a lawful basis to enter Mr. Thompson's home, and Mr. Thompson still was entitled to assert his Fourth Amendment rights without fear of prosecution. Otherwise, if a person can be punished for invoking the warrant requirement simply because it turns out that the police have information supporting exigent circumstances, then no one could ever safely assert his rights. As the original judge in this case stated at trial, "What's a citizen to do under those circumstances?"

The district court further erred by granting qualified immunity. Qualified immunity does not shield knowing violations of the law. After realizing that Mr. Thompson's daughter was never in any danger, Officer Clark did what no reasonable officer would do: charge Mr. Thompson with two crimes by falsifying the contents of a sworn criminal complaint. The decision below should be reversed, and Mr. Thompson's claim should finally be allowed to go to a jury.

3

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over Mr. Thompson's

Fourth Amendment malicious prosecution claim under 28 U.S.C. § 1331. The

district court entered a final order granting summary judgment against Mr.

Thompson on May 18, 2023. JA 546. Mr. Thompson timely noticed his appeal on

June 15, 2023. JA 548. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Whether a reasonable jury could find that Officer Clark lacked

probable cause to initiate criminal proceedings against Mr. Thompson for

obstructing governmental administration when the facts show that Mr. Thompson

opened his door and peacefully told the police he would not let them enter without

a warrant.

2.      Whether it was clearly established that Officer Clark violated the law

by fabricating the contents of a sworn criminal complaint to initiate criminal

proceedings against Mr. Thompson without probable cause.

## STATEMENT OF THE CASE

Mr. Thompson brought this civil rights action under 42 U.S.C. § 1983 based

on an incident in January 2014, when several NYPD officers entered Mr.

Thompson's home because of a 9-1-1 call that was later confirmed to be false.

Mr. Thompson asserted several claims pertaining to the officers' immediate

4

response to the 9-1-1 call, including the warrantless entry into his home and his arrest. The heart of Mr. Thompson's case, however, concerned the events that followed. Namely, after the officers confirmed that there was never any danger to Mr. Thompson's daughter, Officer Clark swore out a criminal complaint falsely accusing Mr. Thompson of two crimes. The charges were later dropped, but the fabrication upended Mr. Thompson's life, job, and reputation.

Mr. Thompson's malicious prosecution claim has never been decided by a jury because Officer Clark has fought tooth and nail to keep it from them. He unsuccessfully moved for summary judgment prior to trial; then, at the close of evidence, he moved for judgment as a matter of law based on a legal argument the Supreme Court later rejected; and finally, he sought reconsideration of the district court's prior denial of summary judgment on remand.

In the decision below, the district court (Hon. Hector Gonzalez) permitted reconsideration in light of the jury's verdict against Mr. Thompson's unlawful entry claim, which the court took to establish that the police had a lawful basis to enter Mr. Thompson's apartment. Based on that assumed exigency, the district court concluded that Officer Clark necessarily had probable cause or arguable probable cause to charge Mr. Thompson with obstruction because he stood in his doorway and "refus[ed] orally" to the police enter. JA 540; *Thompson v. Clark*, --- F. Supp. 3d ---, 2023 WL 3570658, at *5 (E.D.N.Y. May 18, 2023).

5

**I.      Factual Background**

**A.      On January 15, 2014, Larry Thompson's Sister-In-Law Mistook Diaper Rash On Mr. Thompson's Daughter For Signs Of Child Abuse And Called 9-1-1.**

Mr. Thompson is a Navy veteran who has worked for over twenty years as a postal worker. JA 277. He lives in Brooklyn with his wife Talleta Watson, a caregiver at a school for autistic children. JA 187. In January 2014, Talleta gave birth to the couple's daughter, Nala. JA 187-88. On January 15, 2014, Mr. Thompson and Talleta took Nala for her one-week checkup, and Nala received a clean bill of health. JA 188.

At the time, the couple was also caring for Talleta's sister, Camille Watson, who suffered from learning and cognitive delays. JA 187. Unbeknownst to Mr. Thompson and Talleta, at around 10:00 p.m. on January 15, Camille called 9-1-1. JA 243. Camille had heard Nala crying during diaper changes and observed red marks in her niece's buttocks area. JA 163. Camille told the 9-1-1 operator that she suspected Mr. Thompson was abusing Nala. JA 163. As the first responders later confirmed, Nala simply had diaper rash. JA 151. In the words of the district court, "[t]he child was never in any danger." JA 93.

Two emergency medical technicians ("EMTs") were dispatched to Mr. Thompson's apartment. JA 243. Upon entering the apartment, the EMTs saw Talleta holding Nala peacefully. JA 244. One of the EMTs asked Talleta, "Hey, is

6

everything okay? Did you call?" JA 248. Talleta told them she had not called for help. JA 248.

Confused as to why EMTs were in his apartment, Mr. Thompson asked what they were doing. JA 244. The EMTs said that "[s]omebody called 911 about a baby being abused." JA 279-80. Mr. Thompson responded that nobody in the apartment had called. JA 244. He asked Camille if she made the call, and she said she did not. JA 280.

Accordingly, Mr. Thompson told the EMTs, "I'm sorry, you got the wrong apartment. There must be another apartment." JA 280. He tried to help the EMTs brainstorm other apartments with kids. JA 280. The EMTs agreed, saying, "Sorry, we have the wrong apartment." JA 159, 251. They said they would go check on other apartments and left. JA 280.

## B. When Officer Clark And Several Other Officers Arrived, Mr. Thompson Opened His Door And Asked To See A Warrant.

Shortly thereafter, Officer Clark and three other police officers arrived. After speaking with the EMTs, they knocked on Mr. Thompson's door. JA 160. The officers stood outside Mr. Thompson's doorway in a staggered formation, with their guns visible. JA 256, 281.

Mr. Thompson opened the door. JA 156. It was approaching midnight, and Mr. Thompson was in his underwear. JA 279. When he saw the officers, he was

7

confused as to why they were there. JA 305. Mr. Thompson said, "Good night, Officer, is there any problem?" JA 281.

The police responded, "Yeah, we got an anonymous phone call that a child was being abused." JA 281. Mr. Thompson explained that he had just spoken with EMTs about that call, and it had not come from his apartment. JA 281. The lead officer replied, "We got to come in." JA 202, 281.

Mr. Thompson responded, "Sir, if you can give me a good reason." JA 281. The officer said only, "Anonymous phone call." JA 281. Mr. Thompson again attempted to clarify, asking, "Sir, that's not a good reason. Can you tell me who it is?" JA 281. The officer said, "No, it's anonymous." JA 281.

Throughout this interaction, Mr. Thompson believed (correctly) that any such call had been mistaken. JA 282. He knew that Nala had never been abused and was safe with Talleta. They had just taken Nala to her one-week checkup earlier that day, and Nala received a clean bill of health. JA 188. Mr. Thompson could have brought Nala to the door to show the officers that everything was fine, but they did not give him the chance. JA 283. Camille had also assured Mr. Thompson that she was not the one who had called 9-1-1, and the EMTs agreed that they must have the wrong apartment. JA 159, 251, 280.

Mr. Thompson also knew that he had a right not to consent to the police entering his home without a warrant. JA 306. Accordingly, Mr. Thompson told the

officers, "I don't agree to this." JA 281. He did not yell or raise his voice. JA 282.

One of the officers asked, "You're not going to let us in?" JA 281. Mr. Thompson

replied, "I'm not agreeing to it without a warrant." JA 281. He asked to speak with

the officers' supervisor or sergeant. JA 282.

### C. Without Warning Mr. Thompson That He Could Be Arrested If He Did Not Let The Police Enter, The Officers Grabbed Him And Took Him To The Ground.

The officers did not have a warrant. JA 201. Nor did the officers tell Mr.

Thompson that, in their view, they did not need a warrant, or provide any other

information about the 9-1-1 call. JA 202. In fact, as they admitted at trial, they

deliberately withheld additional information from Mr. Thompson. JA 151, 202,

257.

As multiple witnesses confirmed at trial, the officers also did not warn Mr.

Thompson that he could be arrested for not permitting them to enter. JA 176, 283.

For example, one officer testified:

> Q: Officer Romano, you never warned plaintiff he would be placed under arrest for not letting him in; correct?
>
> A: I did not.
>
> Q: You didn't hear any other officers say to him, if you don't let us in, we'll have to place you under arrest?
>
> A: Not that I recall.

JA 176.

Consistent with these accounts, Officer Clark testified during a deposition that Mr. Thompson was never warned that he could be placed under arrest:

> Q: Before you guys entered the apartment, did you tell Mr. Thompson he could be placed under arrest for not letting you in?
>
> A: No.

JA 261.

In the same testimony, Officer Clark reiterated:

> Q: You remember that, that he was not warned of that, right?
>
> A: Correct.

JA 261.

Instead, when Mr. Thompson insisted upon a warrant, the officers grabbed him and took him to the ground. JA 283. Multiple witnesses testified that, as the police were arresting Mr. Thompson, he did not flail his arms or otherwise resist. JA 190, 220, 224, 283. In fact, as he was being pushed to the ground, Mr. Thompson pleaded, "Okay you got it, you got it," to make absolutely clear that he was "not trying to resist or fight back." JA 283.

**D. After The Officers Confirmed They Had Been Mistaken, Officer Clark Made False Allegations To Charge Mr. Thompson With Two Crimes.**

After taking Mr. Thompson to the ground, the officers entered the apartment and quickly confirmed that there had been no child abuse. One of the EMTs went into the bedroom and saw that there was nothing unusual about Nala, who

10

appeared healthy. JA 162. Talleta even told the EMTs that a doctor had confirmed that Nala was perfectly healthy earlier that day, and showed them the documentation. JA 191. The EMTs determined that the baby just had diaper rash. JA 151. As the police later noted in their records, there were "[n]o signs of sexual abuse." JA 265-66.

Rather than releasing Mr. Thompson, however, the officers took Mr. Thompson out of his apartment in handcuffs and detained him at the police precinct. JA 263. As Officer Clark admitted at trial, he knew that "the baby was not abused," and therefore Mr. Thompson could not be charged with child endangerment or other related crimes. JA 263.

Instead, the next day, Officer Clark signed a criminal complaint asserting a fabricated version of the events. Namely, Officer Clark stated that he "instructed" Mr. Thompson to permit the officers to enter his home, and Mr. Thompson "refuse[d]" that order. JA 23. Officer Clark further stated that he "warned" Mr. Thompson that he "could be placed under arrest," and Mr. Thompson "continued to refuse" the order. JA 23. Officer Clark then claimed that, when he attempted to arrest Mr. Thompson, Mr. Thompson "began to flail [his] arms," preventing Officer Clark from handcuffing him. JA 23. These allegations were the only "grounds" that Officer Clark identified to charge Mr. Thompson with two crimes: obstructing governmental administration and resisting arrest. JA 23.

11

The allegations were false. Neither Officer Clark nor any other officer ever warned Mr. Thompson that he could be arrested. JA 176, 283. Officer Clark also never ordered Mr. Thompson to permit the police to enter, and Mr. Thompson did not "refuse" any such order. Rather, when another officer said that the police "had to come inside" because of the 9-1-1 call, Mr. Thompson responded that he would not agree to let the police enter without a warrant. JA 202, 281. And when the officers grabbed Mr. Thompson, he never resisted in any way. JA 190, 220, 224, 283.

Officer Clark's criminal complaint was used as the charging document to initiate criminal proceedings against Mr. Thompson. JA 264. Based on the charges in the complaint, Mr. Thompson was detained until his arraignment on January 17, 2014. JA 64, 288-89. Afterwards, Mr. Thompson was required to make two additional court appearances. JA 64, 98.

With no real case, prosecutors attempted to offer Mr. Thompson a deferred prosecution agreement, telling him that it would make "everything . . . go away." JA 289. Mr. Thompson rejected the agreement and chose to "see this to the end" to vindicate his innocence. JA 289-90. Ultimately, the prosecutors dropped the charges. *See* JA 473.

## II.    Procedural History

On December 17, 2014, Mr. Thompson sued Officer Clark and others under 42 U.S.C. § 1983. Mr. Thompson alleged several claims, including unlawful entry into his home and malicious prosecution. JA 61. For malicious prosecution, Mr. Thompson must establish that (1) Officer Clark initiated criminal proceedings without probable cause, (2) the motive in doing so was malicious, (3) the proceedings terminated in Mr. Thompson's favor, and (4) Mr. Thompson suffered a deprivation of liberty. *See Thompson v. Clark*, 142 S. Ct. 1332, 1338 (2022); *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013).

Before trial, Officer Clark moved for summary judgment, challenging the malicious prosecution claim solely on the ground that Mr. Thompson could not establish the elements of the claim, including a lack of probable cause. JA 50-53. Officer Clark did not argue that he was entitled to qualified immunity on the malicious prosecution claim, asserting that defense only as to the unlawful entry claim. JA 46-47.

The district court rejected Officer Clark's arguments, holding that a reasonable jury could find that the same conduct currently at issue—"standing at his front door and insisting upon a warrant," ECF 53 at 22—did not constitute obstruction. JA 82. The district court recognized that Mr. Thompson was simply exercising his "constitutional right" to demand "that police produce a warrant to

13

enter his home." JA 81. The court also determined that Mr. Thompson was "deprived of his liberty when he was held in jail for two days and then required to make several court appearances before his case was dismissed." JA 82-83.

Accordingly, Mr. Thompson's claims, including malicious prosecution, went to trial. JA 135. The evidence Mr. Thompson presented at trial was consistent with the evidence he offered at summary judgment, demonstrating among other things that, when the police said they needed to enter Mr. Thompson's home, he opened his door and peacefully insisted that the police produce a warrant before entering. *Compare* ECF 53 at 22, *with* JA 281.

At trial, Officer Clark argued on four separate occasions that judgment as a matter of law should be granted against the malicious prosecution claim on one ground: Although prosecutors had dropped the charges against Mr. Thompson, the proceedings had not terminated "in his favor." JA 132, 309; ECF No. 123; ECF No. 125. In response, Mr. Thompson called a witness to testify about the reasons the charges against him were dropped. JA 180-81.

As the district court recognized, the favorable termination issue was the sole ground on which Officer Clark challenged the malicious prosecution claim, "thereby waiving Defendant Clark's ability to renew his Rule 50 motion on any other basis." JA 533-34. Following the close of evidence, the district court granted the motion, and so the jury never decided the malicious prosecution claim. JA 309.

14

The remaining claims were submitted to the jury. On the unlawful entry claim, the jury was instructed that the police generally must have a warrant to enter a home, but exigent circumstances can permit entry without a warrant. JA 347. The court ruled, however, that Mr. Thompson bore the burden of disproving any exigency, rather than requiring the defendants to demonstrate a lawful basis for their entry. JA 121, 125; *see also* JA 126, 300. Having been so instructed, the jury denied relief on Mr. Thompson's remaining claims. JA 86.

Mr. Thompson appealed the dismissal of his malicious prosecution claim and prevailed before the U.S. Supreme Court. *See Thompson v. Clark*, 142 S. Ct. 1332 (2022). Before the Supreme Court, Officer Clark acknowledged that he had challenged the malicious prosecution claim solely "on favorable termination," and not another ground like qualified immunity. *See* Transcript of Oral Argument at 92, *Thompson*, 142 S. Ct. 1332 (No. 20-659). The Supreme Court held that the prosecutors' dismissal of Mr. Thompson's charges satisfied the favorable termination requirement. *Thompson*, 142 S. Ct. at 1341. The Court expressed "no view" on "additional questions that may be relevant on remand," and provided that the district court could consider such questions "as appropriate." *Id.*; *see* Transcript of Oral Argument at 70, *Thompson*, 142 S. Ct. 1332 (No. 20-659) (Justice Kagan noting questions besides favorable termination could be addressed "on remand, assuming you haven't forfeited [them]").

15

On remand, the case was reassigned to a new district court judge following the passing of the prior judge. Before the new judge, Officer Clark brought a second, "successive" motion for summary judgment. JA 495. Officer Clark acknowledged that he had "previously mov[ed] for summary judgment" and lost, but sought "reconsideration" of the prior decision. JA 488, 494. Officer Clark's latest motion challenged the malicious prosecution claim on the same grounds that the district court had previously rejected, including probable cause. *Compare* JA 500-04, 509-13, *with* JA 81-83. In addition, Officer Clark newly asserted qualified immunity, claiming that he "inadvertently failed to raise qualified immunity in his prior motion." JA 506-07. Although Officer Clark had prevented the jury from deciding Mr. Thompson's claim, Officer Clark insisted that Mr. Thompson "had his 'day in court'" and asked the court to grant judgment "as a matter of law" based on the trial record. JA 487, 491.

The district court acknowledged the "prior decision denying summary judgment," but concluded that it could "reconsider" that decision "because of the expanded factual record presented at trial and the jury's resolution of certain prior factual disputes that existed at the summary judgment stage—principally *whether Defendants' entry into Plaintiff's apartment was unlawful*." JA 535-36 (emphasis added). The district court focused on the legal basis for the officers' entry, reasoning that the prior decision "hinged on a single disputed issue—whether

16

Defendants had a lawful reason to demand entry to Plaintiff's apartment." JA 540. The district court interpreted the jury's verdict on Mr. Thompson's unlawful entry claim to establish conclusively that the officers "were performing a lawful function when seeking to enter Plaintiff's apartment." JA 540.

Based on that interpretation of the verdict, the district court determined that there was necessarily probable cause to charge Mr. Thompson with obstruction because Mr. Thompson stood in his doorway and "refus[ed] orally to let them enter." JA 540. As for the charge of resisting arrest, the district court held that probable cause was in dispute, but concluded that no independent deprivation of liberty could be shown if the obstruction charge was supported by probable cause. JA 544-46. Finally, the court held that Officer Clark was entitled to qualified immunity, regardless of whether he falsified the contents of the criminal complaint, because he had "arguable probable cause" to charge Mr. Thompson with obstruction. JA 541. For those reasons, the district court granted summary judgment.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of summary judgment, including a grant based on qualified immunity. *Kee v. City of New York*, 12 F.4th 150, 157 (2d Cir. 2021); *Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006). Summary judgment is appropriate only when "the movant shows that there is no

genuine dispute as to any material fact." *Kee*, 12 F.4th at 158 (quoting Fed. R. Civ.

P. 56(a)). In other words, if the Court determines that "a reasonable jury could

decide in the non-movant's favor," then summary judgment must be denied. *Id.* In

making this determination, the Court must construe the evidence in the light most

favorable to Mr. Thompson, and draw all reasonable inferences in his favor. *Id.*

## SUMMARY OF ARGUMENT

The district court erred by reversing its prior denial of summary judgment on

the ground that the jury's verdict on Mr. Thompson's unlawful entry claim

established exigent circumstances. Even if true, the existence of exigent

circumstances does not convert Mr. Thompson's peaceful invocation of his Fourth

Amendment rights into a crime. It can *both* be true that the police have a lawful

basis to enter a home, and that a citizen can invoke the warrant requirement

without fear of prosecution. Accordingly, even assuming that the police had a

lawful basis to enter Mr. Thompson's apartment, a reasonable jury could still find

that Officer Clark lacked probable cause to charge Mr. Thompson with obstructing

governmental administration. As a result, summary judgment must be denied.

I.A.    The Fourth Amendment creates a presumption that the police must

have a warrant to enter the home, and citizens are entitled to rely on that

presumption. The police may have information supporting exigent circumstances,

but ordinary people usually have no way of knowing whether an exception to the

18

warrant requirement applies. That was the case here: Mr. Thompson believed (with good reason) that there was no ongoing emergency inside his home, and he did not have access to the information that led the police to believe there was an exigency—information that turned out to be false. If citizens can be punished for standing in their doorway and invoking the warrant requirement simply because they were mistaken about whether an exception applied, no citizen could ever safely assert his Fourth Amendment rights.

I.B.    Consistent with the Fourth Amendment, New York's obstruction statute does not apply when a citizen peacefully insists upon a warrant. New York law requires the prosecution to prove both physical interference and specific intent. A reasonable jury could find that Officer Clark lacked probable cause for both essential elements. Either ground is sufficient to deny summary judgment.

I.B.1.  The peaceful assertion of the warrant requirement cannot constitute physical interference, as required by New York's obstruction statute. New York law is clear that "mere words alone" do not constitute obstruction. *People v. Case*, 365 N.E.2d 872, 875 (N.Y. 1977). As a result, "refusing orally" to allow the police to enter without a warrant is not obstruction. JA 540. In fact, such speech is specifically sanctioned by New York law, which requires the police to produce a warrant they are executing "upon request." N.Y. Crim. Proc. Law § 690.50.

19

The fact that Mr. Thompson stood "in the door" while he spoke with the police does not convert his speech into physical interference. JA 540. Mr. Thompson did not affirmatively make physical contact with the police; he "blocked Defendants' path of entry" only in the sense that his body took up space in the doorway. JA 540. New York law is clear that the obstruction statute does not apply "whenever any barrier is placed in the path of process and/or arrest." *See People v. Offen*, 408 N.Y.S.2d 914, 916 (N.Y. Crim. Ct. 1978). Because Mr. Thompson did not commit physical interference, a reasonable jury could find Officer Clark lacked probable cause.

I.B.2.  In addition, a reasonable jury could find that Officer Clark lacked probable cause because Mr. Thompson never intended to interfere with an official function. Rather, he only intended to assert his constitutional rights. Mr. Thompson specifically used the language of the Fourth Amendment, stating, "I'm not agreeing to it without a warrant." JA 281. The reason he believed a warrant was required, moreover, was apparent: He respectfully explained that he had already spoken with the EMTs about the 9-1-1 call, which must have been mistaken. JA 281. When Officer Clark signed the fabricated criminal complaint, he *knew* that Mr. Thompson had been right: The 9-1-1 call was mistaken, and there had been no child abuse. JA 263. A reasonable jury could find that these circumstances

20

demonstrated that Mr. Thompson lacked criminal intent, and therefore that Officer

Clark did not have probable cause.

I.C.    Finally, the district court erred in holding that the resisting arrest

charge did not independently deprive Mr. Thompson of liberty. That ruling turned

solely on the district court's assumption that the obstruction charge was lawful.

Neither charge, however, was supported by probable cause.

II.    The district court also erred by holding that Officer Clark is entitled to

qualified immunity. Officer Clark waived that defense, and even if he had not,

qualified immunity does not protect knowing violations of the law like falsifying

the contents of a criminal complaint.

II.A.   As an affirmative defense, qualified immunity can be waived "by

failure to raise it in a timely fashion." *McCardle v. Haddad*, 131 F.3d 43, 51 (2d

Cir. 1997). Under Rule 50 of the Federal Rules of Civil Procedure, judgment as a

matter of law cannot be granted if qualified immunity was not raised prior to the

jury's verdict. *See Provost v. City of Newburgh*, 262 F.3d 146, 161 (2d Cir. 2001).

In addition, qualified immunity cannot be raised for the first time in a motion to

reconsider. *See Phillips v. City of New York*, 775 F.3d 538, 544 (2d Cir. 2015).

Officer Clark waived qualified immunity on both of these grounds. As the

district court below recognized, Officer Clark failed to raise qualified immunity

against the malicious prosecution claim at trial, "thereby waiving Defendant

21

Clark's ability" to seek judgment as a matter of law under Rule 50. JA 533-34.

Although no verdict was rendered on the malicious prosecution claim, Officer

Clark's latest motion for summary judgment really sought the relief provided by

Rule 50: judgment as a matter of law based on "the evidence presented at trial."

JA 487.

On top of the Rule 50 waiver recognized by the district court, Officer Clark

also failed to raise qualified immunity in his initial motion for summary judgment.

He admitted this, claiming that the failure was due to "inadvertence." *See* JA 506-

07. Inadvertence is not a defense to waiver. In addition, Officer Clark's briefing

shows that the choice was deliberate, as he raised qualified immunity to challenge

a different claim. Accordingly, qualified immunity should be denied.

II.B.1. Officer Clark's qualified immunity defense also fails on the merits.

In 2014, reasonable officers knew not to fabricate the basis for a criminal charge.

This Court has repeatedly made clear that qualified immunity does not shield such

blatant and knowing misconduct. *See, e.g.*, *Manganiello v. City of New York*, 612

F.3d 149, 162 (2d Cir. 2010). In such cases, officers cannot point to "arguable

probable cause" as an excuse. As this Court stated in *Coggins v. Buonora*, 776

F.3d 108 (2d Cir. 2015), "the alleged falsification of evidence" constitutes "a

violation of clearly established law," and "no objectively reasonable public official

could have thought otherwise." *Id.* at 114.

22

II.B.2. In any event, Officer Clark did not have arguable probable cause. In 2014, reasonable officers also knew that New York's obstruction statute does not criminalize speech, and that "it is no crime to refuse to open a door to police officers." *Offen*, 408 N.Y.S.2d at 916. No reasonable officer, therefore, would mistake Mr. Thompson's decision to *open* his door and calmly assert his rights as obstruction. Qualified immunity should be denied.

## ARGUMENT

**I.    The District Court Erred By Assuming That Officer Clark Necessarily Had Probable Cause To Prosecute Mr. Thompson For Obstruction If The Police Had A Lawful Basis To Enter His Apartment.**

Recognizing that Officer Clark lost at summary judgment and went to trial, the district court permitted reconsideration of summary judgment because it interpreted the jury's verdict as establishing that the police had a lawful basis to enter the apartment. JA 540. Based on that interpretation, the district court held that probable cause necessarily existed because Mr. Thompson stood in the doorway of his home and refused to let the police enter. JA 540.

That was error. Even if the police had a lawful basis to enter the apartment,[1] a reasonable jury could still find that Officer Clark lacked probable cause to charge

---

[1] As an initial matter, the district court was wrong to treat the jury's verdict as "resolving" the factual dispute over exigent circumstances. *See* JA 540. The verdict cannot resolve that dispute because it is possible that the jury ruled for the defendants without finding exigent circumstances. The jury had been instructed that it was Mr. Thompson's burden to *disprove* the existence of any exigency, and

23

Mr. Thompson with obstruction. Standing in the doorway of your home and insisting upon a warrant is not a crime, even if the police have a right to enter. The Fourth Amendment creates a presumption that the police must obtain a warrant before entering a home, and ordinary citizens are entitled to rely on that presumption. Consistent with that principle, New York's obstruction statute requires both physical inference and specific intent to interfere, neither of which is satisfied by a person's peaceful exercise of their Fourth Amendment rights.

### A. Citizens Are Entitled To Rely On The Fourth Amendment's Presumption That The Police Must Have A Warrant To Enter The Home.

Under the Fourth Amendment, "the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "At the very core of the Fourth Amendment stands" a person's right "to retreat into his own home and there be free from unreasonable government intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (internal quotation marks omitted); *see Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984)

---

so the jury could have ruled against Mr. Thompson's claim if the evidence were evenly matched. *See* JA 300, 345, 347 ("If the probabilities are evenly balanced, the party with the burden of proof has failed to meet the burden."). As a result, a genuine dispute of fact remains. *See Devilla v. Schriver*, 245 F.3d 192, 197-98 (2d Cir. 2001) (vacating grant of summary judgment because the jury instructions showed that the verdict did not necessarily resolve factual dispute). For the verdict to establish exigent circumstances, the jury needed to "be asked the pertinent question" in a special interrogatory. *Kerman v. City of New York*, 374 F.3d 93, 120 (2d Cir. 2004). Officer Clark chose not to request special interrogatories unless there was a finding of liability. *See* JA 343.

("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."). That right is at its zenith when the police come to the home "in the middle of the night." *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011).

The Fourth Amendment principally protects the home through the warrant requirement. *See Johnson v. United States*, 333 U.S. 10, 17 (1948) (ranking the warrant requirement among "the most fundamental distinctions" of our government). That requirement creates a presumption that the police must obtain a warrant before entering a home. *See Groh v. Ramirez*, 540 U.S. 551, 559 (2004) ("[S]earches and seizures inside a home without a warrant are presumptively unreasonable.").

Citizens are entitled to rely on this presumption and ask to see a warrant before allowing the police to enter their homes. *See v. City of Seattle*, 387 U.S. 541, 546 (1967) ("[A]ppellant may not be prosecuted for exercising his constitutional right to insist that the [police] obtain a warrant."); *United States v. Prescott*, 581 F.2d 1343, 1350 (9th Cir. 1978) ("One cannot be penalized for passively asserting this [Fourth Amendment] right."). That is true even if it turns out that an exception to the warrant requirement, like exigent circumstances, applies. *See Villegas v. Hackett*, 225 F. App'x 580, 581 (9th Cir. 2007) ("[E]ven when officers have a right to enter a home without a search warrant, the

25

homeowner cannot be arrested for refusing admission."). In other words, it can simultaneously be true that the police have a lawful basis to enter a home *and* that the person living there can stand in his doorway and invoke the warrant requirement without fear of prosecution.

Those two things must be compatible because citizens ordinarily will not have the information needed to determine whether an exception to the warrant requirement applies. That information is usually available only to the police. *See Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 532 (1967) ("[W]hen the inspector demands entry, the occupant has no way of knowing . . . the lawful limits of the inspector's power to search."); JA 121 ("Whether there was a need to render emergency aid so compelling requiring immediate action is wholly dependent upon the facts often known only to the police officer at the time of the warrantless entry."). A person can reasonably believe that there is no ongoing emergency—as in this case—even though the police may have information creating a basis to enter without a warrant. The police, of course, may take appropriate action based on the information they possess. But a citizen does not commit a crime by invoking the warrant requirement simply because he did not have the same information as the police.

That was the case here. Mr. Thompson had been with Talleta and Nala all evening, and so he knew, as the district court recognized, that his daughter "was

never in any danger." JA 93. He had also spoken with the EMTs inside his apartment shortly before the police arrived, and explained that they must have "the wrong apartment." JA 280. They *agreed* with him, and told him that they would go check on other apartments—confirming in Mr. Thompson's mind that any 9-1-1 call must have been mistaken. JA 159, 251, 280.

The police knew, moreover, that Mr. Thompson did not have the same information they did. In fact, they deliberately withheld information about the 9-1-1 call from him. JA 257. All the police told Mr. Thompson was that they had received a call and "had to come inside." JA 202. As the original district court judge remarked, "I don't know even how the plaintiff would know what was going on outside provided the exigent circumstances in the police mind." JA 128. "What's a citizen to do under those circumstances?" JA 128.

If the State could punish someone for invoking the warrant requirement simply because it turned out that an exception like exigent circumstances applied, "it would eviscerate the core protections of the Fourth Amendment." *Reed v. Campbell Cnty.*, --- F.4th ---, 2023 WL 5604200, at *7 (6th Cir. Aug. 30, 2023). Citizens would face an impossible dilemma. Failing to invoke the warrant requirement could result in a waiver of any challenge to the entry. *See Lakeland Enters. of Rhinelander, Inc. v. Chao*, 402 F.3d 739, 745 (7th Cir. 2005). Invoking the warrant requirement, however, would mean "risking a criminal conviction."

27

*Camara*, 387 U.S. at 532. The police, moreover, could "use the threat of arrest as coercion to obtain consent to a warrantless search or seizure." *Gasho v. United States*, 39 F.3d 1420, 1431-32 (9th Cir. 1994).

The Fourth Amendment avoids that impossible dilemma by allowing citizens to presume that a warrant is required. If the police produce a warrant, that provides conclusive proof of the police's "official authority" to enter. *See*, 387 U.S. at 543; *see Greer v. City of Highland Park*, 884 F.3d 310, 315 (6th Cir. 2018) ("One primary purpose of a search warrant is to demonstrate that the agents have been granted authorization to search."). At that point, the citizen knows to permit entry because the warrant "announces in effect that the occupant has no right to resist the search." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968); *see Shaheed v. Kroski*, 833 F. App'x 868, 871 (2d Cir. 2020) ("[O]ne can obstruct governmental administration by *refusing to comply with a search warrant*." (emphasis added)).

When the police fail to produce a warrant, however, a citizen like Mr. Thompson can "reasonably believ[e] himself entitled to exclude the officer." *People v. Rodriquez*, 851 N.Y.S.2d 342, 348 (N.Y. Crim. Ct. 2008); *see Kentucky v. King*, 563 U.S. 452, 469 (2011) ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do."). Thus, the citizen can "refuse admission" without fear of prosecution.

*Prescott*, 581 F.2d at 1350. That is precisely what Mr. Thompson did. Whether or not the police had a lawful basis to enter his home, he was entitled to ask to see a warrant.

### B. Mr. Thompson Did Not Commit A Crime By Standing In His Doorway And Asking For A Warrant.

Taking the facts in the light most favorable to Mr. Thompson, a reasonable jury could conclude that Officer Clark lacked probable cause to charge Mr. Thompson with obstruction.[2] New York has defined the crime of obstructing governmental administration to require two essential elements: physical interference and specific intent. A reasonable jury could find that Mr. Thompson satisfied neither element by opening his door and peacefully invoking his Fourth Amendment rights. Either ground is sufficient to deny summary judgment.

> 1. *Mr. Thompson Did Not Physically Interfere With An Official Function By Peacefully Invoking His Fourth Amendment Rights.*

New York's obstruction statute reaches only conduct "obstructing, impairing or perverting the administration of law or other governmental function . . . by means of intimidation, physical force or interference, or by means of any

---

[2] For a claim of malicious prosecution, probable cause requires "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Kee*, 12 F.4th at 166. Probable cause to prosecute is a higher standard than probable cause to arrest, and the two "should not be conflated." *Id.*; *see Stansbury v. Wertman*, 721 F.3d 84, 95 (2d Cir. 2013).

independently unlawful act." N.Y. Penal Law § 195.05. It is well established that this physical interference requirement cannot be satisfied by "mere words alone." *Case*, 365 N.E.2d at 875; *see Ekukpe v. Santiago*, 823 F. App'x 25, 30 (2d Cir. 2020) ("[T]he interference must 'at least in part be "physical" and cannot consist solely of verbal statements.'" (quoting *Kass v. City of New York*, 864 F.3d 200, 209 (2d Cir. 2017)).

Accordingly, this Court has recognized that citizens cannot be charged with obstruction for speech questioning a police order. In *Ekukpe*, this Court held that there was no probable cause to arrest a person for obstruction on the ground that he "fail[ed] to comply with a lawful order" by asking the police for the basis of that order. 823 F. App'x at 30. Even accepting that the order was "lawful," this Court concluded that probable cause did not exist because "a reasonable jury could have found that [the plaintiff] did not 'physically' interfere with the officers' investigation." *Id.*

Accordingly, "standing in the door and refusing orally" to allow the police to enter without a warrant cannot be punished as obstruction. JA 540; *see People v. Maddaus*, 5 A.D.2d 886, 886 (N.Y. App. Div. 1958) (finding that "refus[ing], upon constitutional grounds, to consent to an inspection without a warrant" did not

"interfere with or obstruct" an inspector).[3] Like the plaintiff in *Ekukpe*, Mr. Thompson did nothing but speak with the police, and mere words do not constitute physical interference. Mr. Thompson's speech, moreover, was specifically sanctioned by New York law, which empowers citizens to "request" a warrant, and requires that an officer must "give, or make reasonable effort to give, notice of his authority and purpose to an occupant thereof *before entry* and *show him the warrant* or a copy thereof upon request." N.Y. Crim. Proc. Law § 690.50 (emphasis added).

The district court concluded that Mr. Thompson did more than speak because, by "standing in the door," he "physically blocked Defendants' path of entry." JA 540. But to be clear, the evidence taken in the light most favorable to Mr. Thompson shows that he did not affirmatively make physical contact with the officers. JA 283. Mr. Thompson "blocked" the police only in the sense that his body took up space in the doorway, "block[ing] Defendants' path of entry" into the apartment. JA 540.

That Mr. Thompson's body occupied space in the doorway is not sufficient to establish physical interference. As an initial matter, he had no choice about where he stood: The police were blocking the door from the other side, and so Mr.

---

[3] *Cf. Harris v. State*, 726 S.E.2d 455, 455 (Ga. Ct. App. 2012) (holding that "the peaceable assertion of constitutional rights" does not support "an obstruction conviction").

Thompson's only alternative to standing in the doorway was stepping aside. JA 256, 281. But stepping aside could have been construed as giving the police consent to enter, thereby waiving the Fourth Amendment's protections entirely. *People v. Xochimitl*, 147 A.D.3d 793, 794 (N.Y. App. Div. 2017) (finding consent based on "opening the door and stepping aside"); *People v. Gentry*, 218 A.D.3d 919, 923 (N.Y. App. Div. 2023) ("It is well settled that 'stepping aside from the door to admit the officers is enough to establish consent.'"); *see also* JA 138 (defense counsel arguing that Mr. Thompson should have said "sure, come on in").[4]

Furthermore, New York's obstruction statute does not apply "whenever any barrier is placed in the path of process and/or arrest." *Offen*, 408 N.Y.S.2d at 916. For example, it is well established that "it is no crime to refuse to open a door to police officers," even though the door blocks the police's path of entry. *Id.*; *see also King*, 563 U.S. at 469-70 ("[T]he occupant has no obligation to open the door or to speak."); *Hopkins v. Bonvicino*, 573 F.3d 752, 765 (9th Cir. 2009)

---

[4] Obviously, Mr. Thompson cannot be punished for not waiving his rights. As the Supreme Court stated in *King*, "even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises." 563 U.S. at 470; *United States v. Allen*, 813 F.3d 76, 87 (2d Cir. 2016) ("While Allen had no obligation to open the door or to speak to police officers in the first place, the fact that he—as would most reasonable people—chose to do so does not mean that he forfeited the Fourth Amendment's protections of the home." (citation omitted)).

("[N]othing requires an individual to answer the door in response to a police officer's knocking."). Accordingly, when the police knocked on Mr. Thompson's door, he could have left the door closed without committing obstruction. *Offen*, 408 N.Y.S.2d at 916; *see People v. Perez*, 47 A.D.3d 1192, 1193 (N.Y. App. Div. 2008) (holding that closing the door to police officers is an "exercise of the right to be let alone," not obstruction (internal quotation marks omitted)). If he had, he would have left an obstacle "physically block[ing] Defendants' path of entry to his apartment"—indeed, a far more effective obstacle than his body. JA 540.

What Mr. Thompson chose to do instead was to *open* the door fully and discuss the situation with the officers. *See* JA 156 (officer testifying that the door was "fully opened"). Contrary to Officer Clark's fabricated criminal complaint, Mr. Thompson never did anything physical or violent, and he did not yell or raise his voice. JA 282. Mr. Thompson peacefully and calmly asked the officers for a warrant. *See, e.g.*, JA 245 (Q: "And do you hear Mr. Thompson ever say, Do you have a warrant?" A: "Yes."). In short, he did exactly what the Fourth Amendment and New York law permitted him to do. For that reason, a reasonable jury could find that Officer Clark lacked probable cause, and on that ground, summary judgment should be denied.

2. *Mr. Thompson Never Intended To Interfere With Any Official Function.*

A reasonable jury could also find that Officer Clark lacked probable cause for a second, independent reason: It was apparent that Mr. Thompson never intended to interfere with an official function. New York's obstruction statute establishes a "specific intent" crime, which means that the prosecution must prove that Mr. Thompson "intended to obstruct the administration of law or governmental function." *Rodriquez*, 851 N.Y.S.2d at 346. Simply refusing to let the police enter a private space in the home does not "evince the requisite intent to obstruct the police investigation." *People v. Goli*, 934 N.Y.S.2d 782, 783 (N.Y. App. Div. 2011) (finding no specific intent when an individual locked her bedroom door and refused to comply with a police order to open it). That is especially true when the person expresses that he only intends to prevent the police from entering "without a warrant." *See People v. Williams*, 847 N.Y.S.2d 898, at *1, *3 (N.Y. Crim. Ct. 2007) (noting this "could be viewed as protective of an important constitutional right").

Here, when the officers said they needed to enter Mr. Thompson's home, he responded by using the language of the Fourth Amendment, stating, "I'm not agreeing to it *without a warrant*." JA 281 (emphasis added). He did not say that he would prevent the police from entering under any circumstances—to the contrary, he indicated that he *would* let them enter if they showed him a warrant or provided

34

him a "good reason." JA 281. The language he used made clear that his intent was not to obstruct the police's investigation, but to invoke his Fourth Amendment rights.

Mr. Thompson's lack of criminal intent would have been apparent to Officer Clark when he signed the criminal complaint. Throughout the interaction at Mr. Thompson's door, Mr. Thompson showed that he did not understand the basis for the police's concern. When he answered the door, he asked, "Good night Officer, is there any problem?" JA 281. He explained that he had already discussed the 9-1-1 call with the EMTs, and that the call must have been mistaken. JA 281. The officers may have thought differently, but they deliberately "withheld" information about the call from Mr. Thompson. JA 257. Having chosen to keep Mr. Thompson in the dark, they knew he would not understand why they believed there were exigent circumstances. As the lead officer testified, "I remember telling him that we had a call. We had . . . to come inside. I remember using those words. I don't know of any additional information." JA 202. Officer Clark could see, therefore, that Mr. Thompson genuinely believed that a warrant was required based on the information he possessed. For this reason, a reasonable jury could conclude that Officer Clark lacked probable cause, and summary judgment should be denied.

35

### C. The District Court's Analysis Of The Resisting Arrest Charge Fails Because Neither Charge Was Supported By Probable Cause.

Because the district court's analysis of the obstruction charge was erroneous, its analysis of the resisting arrest charge necessarily fails, as well. The district court correctly recognized that a reasonable jury could find that Officer Clark lacked probable cause to charge Mr. Thompson with resisting arrest. JA 544. But the court granted summary judgment on the assumption that the obstruction charge was necessarily supported by probable cause, and therefore that any restraint on Mr. Thompson's liberty would have occurred regardless of the resisting arrest charge. JA 544-46. A reasonable jury could find that neither charge, however, was supported by probable cause. Accordingly, as the district court previously determined, Mr. Thompson was deprived of his liberty. *See* JA 82-83.

## II. Qualified Immunity Should Be Denied.

The district court also erred by granting Officer Clark qualified immunity. In doing so, it overlooked Officer Clark's waiver of the defense, and it wrongly extended qualified immunity to a knowing violation of the law. No reasonable officer would believe that it was lawful to prosecute Mr. Thompson without probable cause using a falsified criminal complaint that blatantly misrepresented Mr. Thompson's actions.

### A.     Officer Clark Waived The Defense Of Qualified Immunity.

As an affirmative defense, qualified immunity can be waived by the "failure to raise it in a timely fashion." *McCardle*, 131 F.3d at 51. Here, Officer Clark waived the defense twice over, failing to assert qualified immunity in both his prior summary judgment motion and in his pre-verdict motion for judgment as a matter of law.

Starting with Officer Clark's pre-verdict motion, under Rule 50, "[i]f the case proceeds to trial," qualified immunity must be timely raised in a pre-verdict motion for judgment as a matter of law. *Id.* at 50. If the defense is not raised before the verdict, it "cannot properly be decided by the court as a matter of law" following the verdict. *Id.* This rule ensures that the plaintiff receives "notice of defects in its proof so that it can cure them before the case goes to the jury." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir. 1993).

Officer Clark had at least four opportunities to argue for judgment as a matter of law prior to the verdict, and each time, he raised only the issue of whether Mr. Thompson could satisfy the favorable termination requirement. *See* JA 132, 309; ECF No. 123; ECF No. 125. Because Officer Clark raised this challenge prior to the verdict, Mr. Thompson had an opportunity to call a witness to testify about the reasons the charges against him were dropped. JA 179. As the district court recognized, by failing to "argue that Plaintiff's malicious prosecution

claim failed for any other reason," Officer Clark "waiv[ed]" his ability to "renew his Rule 50 motion on any other basis"—including qualified immunity. JA 533-34; *see Provost*, 262 F.3d at 161 ("Because Roper did not specifically include a qualified immunity argument in his pre-verdict request for judgment as a matter of law, he could not have included such an argument in his post-verdict motion.").

Nevertheless, after his favorable termination argument was rejected by the Supreme Court, Officer Clark sought judgment "as a matter of law" based on qualified immunity. JA 487, 491. Although he had not raised this challenge prior to the close of evidence, Officer Clark argued that Mr. Thompson already "had his 'day in court'" and "presented all of his evidence in support of all his claims, *including his federal malicious prosecution claim*." JA 487 (emphasis added). In other words, he sought exactly the relief provided by Rule 50: judgment as a matter of law based on the trial record.

Officer Clark tried to circumvent this waiver by styling his motion as seeking summary judgment, not judgment as a matter of law under Rule 50. Both, however, are governed by the same legal standard. *See Conte v. Cnty. of Naussau*, 596 F. App'x 1, 5 (2d Cir. 2014). And although it is true that the jury never rendered a verdict on Mr. Thompson's malicious prosecution claim, that is because Officer Clark chose to bring one—and only one—challenge to the evidence presented at trial: that it failed to establish the favorable termination requirement.

By later seeking judgment as a matter of law on an unraised ground, Officer Clark sought to do exactly what Rule 50 prohibits, sandbagging Mr. Thompson with a new challenge to the trial record. *Samuels*, 992 F.2d at 14.

In addition, Officer Clark's framing of his motion as seeking summary judgment cannot save his qualified immunity defense because he *also* failed to raise the defense in his initial motion for summary judgment. Arguments raised for the first time in a motion for reconsideration are "not properly presented to the district court," and thus are waived. *Phillips*, 775 F.3d at 544; *Tillmon v. Douglas Cnty.*, 817 F. App'x 586, 590 (10th Cir. 2010) (declining to address qualified immunity arguments "first raised in [defendants'] motion for reconsideration"). Here, when Officer Clark moved for summary judgment in 2017, he never asserted qualified immunity as to Mr. Thompson's malicious prosecution claim. *See* JA 50-53. But on remand, he asked the district court to "reconsider" its prior ruling based on the previously unraised defense. JA 494.

Officer Clark admitted this below, claiming that "he inadvertently failed to raise qualified immunity." *See* JA 506-07. But inadvertence is no exception to waiver. *See Phillips*, 775 F.3d at 544 (denying reconsideration on new grounds). In addition, it is clear that the omission was *not* inadvertent: In the 2017 motion, Officer Clark specifically asserted qualified immunity against the claim of unlawful entry, and chose not to raise the same defense for the malicious

prosecution claim. *See* JA 47, 50-53. That omission was deliberate. *See Henderson v. Thieret*, 859 F.2d 492, 497 (7th Cir. 1988) ("[I]t is one thing to omit the defense altogether in the district court and quite another to raise it as to one claim and yet fail to pursue it as to other claims.").

The district court appeared to overlook this waiver based on its interpretation of the Supreme Court's mandate, which noted that the district court could consider "additional questions that may be relevant on remand," including qualified immunity, "as appropriate." *Thompson*, 142 S. Ct. at 1341. But the Supreme Court made clear that it was expressing "no view" on those questions, including whether it was appropriate to address them, or whether they have been waived. *See id.*; *see also* Transcript of Oral Argument at 70, *Thompson*, 142 S. Ct. 1332 (No. 20-659) (Justice Kagan noting questions besides favorable termination could be addressed "on remand, *assuming [defendants] haven't forfeited it*" (emphasis added)). Officer Clark's repeated failure to raise qualified immunity makes it inappropriate to grant judgment as a matter of law on that basis. He cannot "use the accident of remand as an opportunity to reopen waived issues." *United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001). Accordingly, qualified immunity should be denied.

**B. Officer Clark's Defense Fails On The Merits.**

1. *No Reasonable Officer Would Falsify The Contents Of A Criminal Complaint To Charge Someone With A Crime.*

Officer Clark's qualified immunity defense also fails on the merits. "The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). And it is especially clear that officers cannot prosecute a person without probable cause *by lying*. This Court has made abundantly clear that such misconduct violates the Constitution. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) (denying summary judgment for malicious prosecution claim where officers "lied about the circumstances surrounding [the plaintiff's] arrest"); *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003) (denying summary judgment where officer "lied in order to secure an indictment"). As this Court held in *Manganiello*, "no reasonable officer could have believed" that it was lawful to "misrepresent" evidence or make "statements that were false." 612 F.3d at 165.

Accordingly, when officers lie to charge people with crimes, as Officer Clark did, they are not entitled to qualified immunity. *See id.*; *Dufort v. City of New York*, 874 F.3d 338, 354 (2d Cir. 2017) (denying qualified immunity where

41

officer "intentionally withheld or manipulated key evidence").[5] As discussed

above, the evidence shows that Officer Clark fabricated the contents of his sworn

criminal complaint. Officer Clark's assertion that Mr. Thompson was warned that

he could be arrested, for example, was flat-out false: As Officer Clark

acknowledged under oath, Mr. Thompson "was not warned of that." JA 261. Nor

did Mr. Thompson ever flail his arms to resist arrest, as Officer Clark asserted.

JA 190, 220, 224, 283. No reasonable officer would think that it was lawful to

concoct such lies and use them to initiate criminal proceedings.

The district court held that officers who engage in such misconduct can still

be entitled to qualified immunity if there is "arguable probable cause." JA 541-52.

The concept of "arguable probable cause," however, was designed for "situations

where an officer may have reasonably but mistakenly concluded that probable

cause existed." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). The doctrine

exists because qualified immunity "accommodates an official's reasonable error."

*Catanzaro v. Weiden*, 140 F.3d 91, 96 (2d Cir. 1998).

---

[5] *See also Golino*, 950 F.2d at 871 ("Where an officer knows, or has reason to
know, that he has materially misled a magistrate on the basis for a finding of
probable cause . . . the shield of qualified immunity is lost."); *Hampton v.
Oktibbeha Cnty. Sheriff Dep't*, 480 F.3d 358, 364 (5th Cir. 2007) ("A reasonable
officer would know that lying to a judge in order to procure an arrest warrant was
unlawful.").

Arguable probable cause cannot be used "as a shield for individuals who 'knowingly violate the law.'" *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000). For example, in *Coggins*, this Court denied qualified immunity where officers "knowingly falsified and omitted material facts from police reports, lied to the district attorney and the grand jury, and conspired to do the same, resulting in the malicious prosecution" of the plaintiff. 776 F.3d at 109. Importantly, the Court never asked whether the officers' misconduct could be ignored or excused because of other facts supporting "arguable probable cause." *See id.* at 114. Rather, "the alleged falsification of evidence" constituted "a violation of clearly established law," and this Court held that "no objectively reasonable public official could have thought otherwise." *Id.*

So too here. Officer Clark admitted that, when he signed the complaint, he knew that "the baby was not abused," and therefore Mr. Thompson could not be charged with child endangerment or other related crimes. JA 263. In order to charge Mr. Thompson with some crime, Officer Clark falsely asserted that he, personally, "warned" Mr. Thompson that he "could be placed under arrest," and further falsely asserted that Mr. Thompson "continued to refuse" that order and then flailed his arms to resist arrest. JA 23. Those fabricated allegations were the

43

sole grounds on which the charges were based. JA 23. The district court was wrong to extend qualified immunity to such knowing misconduct.[6]

The cases cited by the district court are not to the contrary. *See* JA 542. Two of those cases granted qualified immunity notwithstanding minor, immaterial exaggerations by the police. *See Soomro v. City of New York*, 739 F. App'x 51, 53-54 (2d Cir. 2018) (discussing officer's "exaggeration" about how much of his body was caught in a moving taxi); *Richardson v. McMahon*, No. 22-582, 2023 WL 3102910, at \*2 (2d Cir. Apr. 27, 2023) (rejecting "minor inconsistencies" between officers' testimony). The other case did not concern knowingly false testimony by the police. *See Frost v. N.Y. City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020). Rather, in that case, this Court held that an eyewitness identification allegedly

---

[6] This Court should be especially reluctant to extend qualified immunity here, given the "shaky ground" on which that doctrine already sits. *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., statement respecting denial of certiorari). One reason to question qualified immunity is that, at common law, an immunity defense applied—if at all—only to actions taken in good faith. *Ziglar v. Abbasi*, 582 U.S. 120, 158 (2017) (Thomas, J., concurring in part) (explaining that modern qualified immunity bears no resemblance to "the defense of good faith and probable cause" available for certain torts at common law); *Baxter v. Bracey*, 140 S. Ct. 1862, 1864 (2020) (Thomas, J., dissenting from denial of certiorari). Good faith is absent in circumstances like these where an officer fabricates the basis for a criminal charge. It would be especially perverse, therefore, to shield such conduct on the basis of a doctrine that is already "flawed—foundationally—from its inception." *Rogers v. Jarrett*, 63 F.4th 971, 979 (5th Cir. 2023) (Willett, J., concurring) (citing the original text of Section 1983 that "nullif[ied] all common-law defenses against § 1983 actions"); *see also Wyatt v. Cole*, 504 U.S. 158, 171 (1992) (Kennedy, J., concurring) (noting that Section 1983 "on its face does not provide for *any* immunities" (quoting *Malley v. Briggs*, 475 U.S. 335, 342 (1986)).

coerced by the police did not undermine probable cause because the other evidence—including the plaintiff's own admissions—was overwhelming. *Id.* at 243-44.

Here, in contrast, Officer Clark did not "exaggerate" a minor, immaterial detail. Rather, Officer Clark fabricated the entire basis for both charges against Mr. Thompson. Under cases like *Coggins* and *Manganiello*, qualified immunity should be denied.

2. *Officer Clark Lacked Arguable Probable Cause To Prosecute Mr. Thompson For Obstruction.*

In any event, even if arguable probable cause could apply to this type of knowing misconduct, Officer Clark lacked arguable probable cause. That standard requires that "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Escalera*, 361 F.3d at 743. This Court has made clear that "arguable probable cause" does not mean "almost" probable cause. *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007). Rather, the standard of probable cause "is the same in both inquiries." *Id.* Here, "no reasonably competent officer could agree" that standing in the doorway of your home and asking for a warrant constitutes obstruction. *Penree by Penree v. City of Utica*, 694 F. App'x 30, 34 (2d Cir. 2017).

45

In 2014, it was clearly established that "mere words" cannot be criminalized as obstruction. *See Case*, 365 N.E.2d at 875. Even provocative statements to the police do not constitute obstruction. *See People v. Grullon*, 862 N.Y.S.2d 810, at *3 (N.Y. Crim. Ct. 2005) ("Go f*** yourself."); *People v. Castro*, 918 N.Y.S.2d 399, at *8 (N.Y. Sup. Ct. 2010) (finding no basis to arrest for saying, with fists clenched, "If you didn't have that gun or badge, I would f*** you up."); *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 415 (2d Cir. 1999) (holding that speech like "One day you're gonna get yours" "cannot be the basis for a legitimate arrest"). It was clear to every reasonable officer, therefore, that *constitutionally protected speech* like asking for warrant does not constitute obstruction. *See Williams*, 847 N.Y.S.2d 898, at *3 (noting that refusing warrantless entry "could be viewed as protective of an important constitutional right"). In fact, New York law expressly directs officers to comply with such requests when executing search warrants. *See* N.Y. Crim. Proc. Law § 690.50.

In 2014, it was also clearly established that the obstruction statute cannot be used to criminalize speech simply because the plaintiff left a "barrier . . . in the path of process and/or arrest." *Offen*, 408 N.Y.S.2d at 916. Every reasonable officer knew that people are free to turn the police away in their own home. *See Georgia v. Randolph*, 547 U.S. 103, 115 (2006) ("[T]he poorest man may in his cottage bid defiance to all the forces of the Crown."); *Payton v. New York*, 445

46

U.S. 573, 589-90 (1980) ("[A]t the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (cleaned up)). Thus, Mr. Thompson did not have to open his door to the officers at all. *Perez*, 47 A.D.3d at 1193 ("Defendant was not required to . . . open his door to the officers."). If he had left the door closed, the police could take appropriate action to remove the obstacle, but they could not charge Mr. Thompson with obstruction. *Offen*, 408 N.Y.S.2d at 916 ("[I]t is no crime to refuse to open a door to police officers.").

Rather than turning the police away, Mr. Thompson *opened* his door and calmly told the officers he would not agree to entry without a warrant. Under those circumstances, no reasonable officer would think that Mr. Thompson had committed obstruction. *See Gem Fin. Serv., Inc. v. City of New York*, 298 F. Supp. 3d 464, 488 (E.D.N.Y. 2018) (rejecting assertion that an individual's "requests for warrants or more substantial evidence were themselves the justifications for the arrest").

The district court relied on two cases to hold otherwise, but neither shows that there was arguable probable cause here. *See* JA 541. First, in *Lennon v. Miller*, 66 F.3d 416 (2d Cir. 1995), a person was arrested for obstruction because she locked herself in a car and attempted to drive away after being shown the owner's certificate of title and valid registration, which the police verified with the DMV.

47

*Id.* at 424. This Court noted that, like a warrant, the ownership documents evidenced the police's authority to take possession of the car. *Id.* Even with those documents, the district court "determined that the arrest of the plaintiff was unauthorized and dismissed the charge against her," and this Court held only that the issue of probable cause was arguable. *Id.*

If *Lennon* was a close case, it is because the person "locked herself in the car and attempted to start the engine" *after* the police conclusively established the basis of their authority using the ownership documents. *Id.* Here, in contrast, Mr. Thompson was peacefully asking the police to produce a warrant when they barged into his apartment and took him to the ground. JA 219 ("I could hear him asking them for a warrant. By that time they were already trying to get in."). If the police had shown him a warrant, and *then* he took action to physically block their entry, this case might look more like *Lennon*. *See Shaheed*, 833 F. App'x at 870 ("[O]ne can obstruct governmental administration by *refusing to comply with a search warrant*." (emphasis added)). Mr. Thompson's unanswered request for a warrant that the police could not produce, however, was not obstruction.

Finally, *Johnson v. City of New York*, No. 05-cv-7519, 2008 WL 4450270 (S.D.N.Y. Sept. 29, 2008), could not be more different from this case. There, police officers responded to six different 9-1-1 calls reporting a domestic dispute between the plaintiff and his girlfriend. *Id.* at *1. Upon arriving, the police found

48

the plaintiff's girlfriend "hysterical and crying," and with minor injuries. *Id.* She told the police that the plaintiff had physically forced her out of the apartment. *Id.* When the officers entered the apartment, the plaintiff resisted arrest, refusing multiple orders to "give [the police] his arms so they could place him in handcuffs." *Id.* at *10. Under those circumstances, the district court concluded that there was probable cause for obstruction. *Id.* This Court never reviewed the correctness of that determination.

Here, in contrast, the police did not hear Nala or anyone else crying or in distress, or see any injuries or signs of harm. JA 148. When the officers knocked on Mr. Thompson's door, he opened the door and spoke with the officers calmly and peacefully. JA 148. By one officer's account, the conversation lasted "about 30 seconds." JA 148. And when the officers took Mr. Thompson down, he never resisted. JA 190, 220, 224; JA 283. Under those circumstances, no reasonable officer would believe that Mr. Thompson had committed obstruction. Qualified immunity should be denied.

## CONCLUSION

For the foregoing reasons, the Court should reverse the decision below and remand for a trial on Mr. Thompson's malicious prosecution claim.

Dated: September 27, 2023    Respectfully submitted,

/s/ *Gregory Cui*
Amir Ali
Gregory Cui
George Mills*
RODERICK & SOLANGE MACARTHUR
  JUSTICE CENTER
501 H Street NE, Suite 275
Washington, D.C. 20002
(202) 869-3434
gregory.cui@macarthurjustice.org

Cary London
SHULMAN & HILL
One State Street Plaza, 15th Floor
New York, N.Y. 10004
(212) 203-1090

David A. Zelman
LAW OFFICE OF DAVID A. ZELMAN
709 Eastern Parkway
Brooklyn, N.Y. 11213
(718) 210-6490

*Counsel for Plaintiff-Appellant Larry Thompson*

**Admitted only in California and practicing under the supervision of attorneys who are admitted in the District of Columbia.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

1.      This brief complies with the type-volume limitations of Local Rule 32.1(a)(4)(A) because this brief contains 11,866 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.


Dated: September 27, 2023                    */s/ Gregory Cui*                
                                             Gregory Cui

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 27, 2023        */s/ Gregory Cui*
                                      Gregory Cui

# SPECIAL APPENDIX
## TABLE OF CONTENTS

Memorandum & Order, ECF 172 (docketed May 18, 2023) .............................SA 1

Judgment, ECF 173 (docketed May 23, 2023) ....................................................SA 18

Amended Memorandum & Order, ECF 77 (docketed June 26, 2018).............SA 19

U.S. Const. amend. IV ........................................................................................SA 48

N.Y. Penal Law § 195.05......................................................................................SA 48

N.Y. Penal Law § 205.30......................................................................................SA 49

N.Y. Crim. Proc. Law § 690.50 ..........................................................................SA 49

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

LARRY THOMPSON,

               Plaintiff,

      v.

PAGIEL CLARK,

             Defendant.

**MEMORANDUM & ORDER**
14-CV-07349 (HG) (RML)

**HECTOR GONZALEZ**, United States District Judge:

      Plaintiff's claim for malicious prosecution against Defendant Pagiel Clark has been reinstated by the U.S. Supreme Court after Judge Weinstein, who previously presided over this case, dismissed the claim as a matter of law following the close of evidence at trial, and before presenting it to the jury with Plaintiff's remaining claims, all of which the jury rejected. *See Thompson v. Clark*, 142 S. Ct. 1332 (2022). Defendant has moved for summary judgment dismissing that claim based on the undisputed facts demonstrated by the evidence admitted at trial and the jury's verdict. ECF No. 163. Plaintiff opposes that motion and insists that a second trial is necessary, principally because Judge Weinstein declined to dismiss Plaintiff's malicious prosecution claim during a pre-trial summary judgment motion. ECF No. 77.

      The Court grants Defendant's motion for summary judgment. Based on the expanded factual record and Plaintiff's own account of the relevant facts, no reasonable juror could conclude that Defendant lacked probable cause to submit to state prosecutors a criminal complaint charging Plaintiff with the misdemeanor of obstructing governmental administration. Alternatively, the Court holds that Defendant is entitled to qualified immunity in bringing that charge. Plaintiff's separate charge for the misdemeanor of resisting arrest also fails to support a malicious prosecution claim because Plaintiff cannot demonstrate that the resisting arrest charge

**SA 1**

led to any deprivation of his liberty that was independent of the valid charge for obstructing governmental administration.

**FACTUAL BACKGROUND**

Plaintiff was arrested in January 2014 during an encounter with four police officers outside his apartment. ECF No. 169 ¶¶ 1, 7. Three of those police officers were formerly Defendants in this case, but the claims against them were dismissed after they received a jury verdict in their favor at trial. *See* ECF No. 137. The fourth police officer was Defendant Clark, who remains as the sole Defendant in this case. Defendant and the other officers came to Plaintiff's apartment, together with two emergency medical technicians, because the police had received a call from the sister of Plaintiff's then-fiancée and the mother of his infant child, who was living in Plaintiff's apartment at the time. ECF No. 169 ¶¶ 1–6. The parties agree that the information conveyed during the call included allegations of child abuse occurring in Plaintiff's apartment. *Id.* The parties disagree about the exact information provided during the phone call and whether the information was credible enough for Defendants reasonably to believe that Plaintiff had committed any misconduct involving his child. *Id.* They further dispute whether the information suggested that there was any abuse currently in progress so that exigent circumstances justified Defendants' warrantless entry into Plaintiff's apartment. *Id.*

The parties dispute what transpired when Plaintiff answered his apartment door and spoke to Defendants—particularly whether Plaintiff used any physical force against Defendants and whether he initiated that force. During Plaintiff's trial testimony, he acknowledged that he stood in his doorway and "told the officers that they couldn't come in without a search warrant" and that he would not "agree to [them] coming in without it." ECF No. 147 at 708:16–19. At some point during their conversation, Plaintiff testified that he "asked for a supervisor and a

2

sergeant." ECF No. 146-2 at 615:21–23; ECF No. 147 at 710:15–24. Plaintiff conceded that he did not "let him in." ECF No. 146-2 at 616:7–10.

After refusing to let the first responders enter, Plaintiff said that one of the police officers, former Defendant Montefusco, "rushed me and grabbed my arm because I was holding the door open and grabbed my arm and then put me in a choke lock front." *Id.* at 611:10–12, 611:18–612:5. Plaintiff insisted that Officer Montefusco started the "physical interaction" after Plaintiff made clear that he would not let the officers into his apartment. *Id.* at 617:12–23. After Officer Montefusco allegedly initiated the use of force, Plaintiff said that the remaining officers, including Defendant Clark, joined in and pushed Plaintiff to the floor. *Id.* at 620:24–623:4. Plaintiff testified that he did not initiate force by pushing an officer and that once the officers began to use force, he did nothing to resist their arrest. *Id.* at 617:24–25, 619:10–16. Plaintiff estimated that his conversation with the officers leading up to his arrest lasted a total of "three to four minutes." *Id.* at 615:13–16.

The parties agree that as a result of Plaintiff's encounter with the police at his apartment, he was arrested, detained for approximately one day while waiting to be arraigned, and that after being arraigned, he was released on his own recognizance. ECF No. 169 ¶¶ 10–11. Plaintiff was charged with two offenses, both of which are Class A misdemeanors: (i) obstructing governmental administration in the second degree ("OGA"), in violation of N.Y. Penal Law § 195.05, and (ii) resisting arrest, in violation of N.Y. Penal Law § 205.30. *Id.* ¶ 10. Defendant Clark submitted the sworn criminal complaint that was used to charge Plaintiff. ECF No. 57-1 at 2. Based on Plaintiff's account of the events, he asserts that Defendant Clark falsely stated in the criminal complaint that Defendant Clark had "warned" Plaintiff that he "could be placed under arrest" and that, once officers "attempted to place [Plaintiff] under arrest, [Plaintiff] began to flail

**SA 3**

[his] arms preventing [officers] from placing handcuffs on [Plaintiff]." *Id.* After Plaintiff was arraigned, he made two court appearances, after which the criminal charges against him were dismissed. ECF No. 169 ¶ 12.

## PROCEDURAL HISTORY

Plaintiff asserted several claims against Defendant Clark and his former co-Defendants, all of which were based on 42 U.S.C. § 1983 ("Section 1983"). *See* ECF No. 34 ¶¶ 22–88. Those claims consisted of malicious prosecution, false arrest, excessive force, denial of a right to a fair trial, failure to intervene, and denial of medical treatment. *Id.* Plaintiff's final claim was that Defendants violated Section 1983 and his rights under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment by entering his apartment without either a warrant or the existence of exigent circumstances justifying a warrantless entry. *Id.* ¶¶ 83–88.

Only Plaintiff's malicious prosecution claim remains following pre-trial summary judgment motions decided by Judge Weinstein and a trial presided over by Judge Weinstein before the case was reassigned. As explained in greater detail below, Judge Weinstein denied the portion of Defendants' pre-trial motion for summary judgment seeking the dismissal of Plaintiff's malicious prosecution claim. ECF No. 77. Although the jury rendered a verdict completely in favor of Defendants with respect to Plaintiff's other claims, *see* ECF No. 137, Plaintiff's claim for malicious prosecution never reached the jury. Following the close of evidence, Judge Weinstein granted Defendants' motion pursuant to Rule 50 for judgment as a matter of law dismissing Plaintiff's malicious prosecution claim. That dismissal was based solely on Plaintiff's failure to demonstrate that the prosecution against him in state court was terminated in his favor in a manner that affirmatively indicated his innocence. ECF No. 147 at 685:15–691:6. In making their Rule 50 motion, Defendants did not argue that Plaintiff's

malicious prosecution claim failed for any other reason, *see id.*, thereby waiving Defendant Clark's ability to renew his Rule 50 motion on any other basis.

Plaintiff appealed the dismissal of his malicious prosecution claim to the Second Circuit and, ultimately, to the Supreme Court. During that appeal, the Supreme Court abrogated the previously-existing Second Circuit case law regarding malicious prosecution claims by "hold[ing] that a Fourth Amendment claim under § 1983 for malicious prosecution does not require the plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence." *Thompson v. Clark*, 142 S. Ct. 1332, 1341 (2022).[1] In remanding the case, the Supreme Court did not hold that Plaintiff had prevailed on his malicious prosecution claim or that the claim required a new trial and instead "remand[ed] for further proceedings consistent with [its] opinion." *Id.* In doing so, the Court described several additional issues of fact and law that potentially remained relevant to Plaintiff's malicious prosecution claim on remand, "including whether [Plaintiff] was ever seized as a result of the alleged malicious prosecution, whether he was charged without probable cause, and whether [Defendant] is entitled to qualified immunity." *Id.* The Court said that "the Second Circuit or the District Court as appropriate may consider those and other pertinent questions." *Id.*

The Second Circuit's mandate transferring jurisdiction back to this Court similarly did not require a new trial. ECF No. 158. That mandate simply "VACATE[D] the judgment of the district court," which had stated that Plaintiff was entitled to no damages from Defendant Clark and the other, former defendants, and "REMAND[ED] this case for further proceedings consistent with the Supreme Court's decision." *Id.*

---

[1]    Unless noted, case law quotations in this order accept all alterations and omit internal quotation marks, citations, and footnotes.

**SA 5**

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, a court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

In deciding a summary judgment motion, any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir. 1995). Although "courts must refrain from assessing competing evidence in the summary judgment record and avoid making credibility judgments," a plaintiff must defeat summary judgment by putting forth "evidence on which the jury could *reasonably* find for the non-moving party." *Saeli v. Chautauqua Cty.*, 36 F.4th 445, 456 (2d Cir. 2022) (emphasis in original) (affirming summary judgment dismissing complaint).

Judge Weinstein's prior decision denying summary judgment in favor of Defendant Clark on Plaintiff's malicious prosecution claim, *see* ECF No. 77 at 26–27, does not preclude the Court from granting summary judgment at this stage. Plaintiff's assertion that the prior summary judgment decision is binding as the law of the case is incorrect. The law of the case doctrine

6

requires that "where a case has been decided by an appellate court and remanded, the court to which it is remanded must proceed in accordance with the mandate and such law of the case as was established by the appellate court." *Kerman v. City of N.Y.*, 374 F.3d 93, 109 (2d Cir. 2004). However, with respect to a court's own decisions, "[t]he doctrine of law of the case is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013). Reconsidering whether summary judgment is appropriate here is particularly appropriate because of the expanded factual record presented at trial and the jury's resolution of certain prior factual disputes that existed at the summary judgment stage—principally whether Defendants' entry into Plaintiff's apartment was unlawful.

Even if the Second Circuit's mandate had expressly remanded Plaintiff's malicious prosecution claim for a new trial, "[t]he granting of a new trial does not preclude a party from moving for summary judgment." *Adams v. Yale-New Haven Hosp.*, No. 06-cv-1166, 2012 WL 359968, at *2 (D. Conn. Feb. 2, 2012). The Second Circuit has affirmed multiple decisions granting summary judgment after either it or the district court had ordered a new trial. *See Girden v. Sandals, Int'l*, 67 F. App'x 27, 28 (2d Cir. 2003); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 260–61 (2d Cir. 2002). *See also Callahan v. Wilson*, 863 F.3d 144, 154 (2d Cir. 2017) (remanding case "for a new trial" because of improper jury instruction); *Callahan v. Cty. of Suffolk*, No. 12-cv-2973, 2022 WL 1283610, at *3 (E.D.N.Y. Apr. 29, 2022) (granting summary judgment motion in favor of defendants on remand).

Just as Judge Weinstein's prior denial of summary judgment does not require the Court to deny summary judgment again, the factual issues determined by the jury's verdict are not binding through collateral estoppel, as they would be in a subsequent lawsuit between the parties.

7

**SA 7**

*DeVilla v. Schriver*, 245 F.3d 192, 196–97 (2d Cir. 2001). Instead, the Second Circuit has explained that, in circumstances like these, in which some of a plaintiff's claims are dismissed at trial before reaching the jury, and then reinstated on appeal, the district court on remand may defer to the jury's verdict as the "law of the case" but may not automatically give it preclusive effect. *Id.* at 197. A district court has discretion to decide how much weight to assign to a jury's verdict, and it should apply that discretion based "on the interpretation and quality of the verdict itself." *Bradshaw v. Hernandez*, 788 F. App'x 756, 759 (2d Cir. 2019) (affirming district court's grant of motion for summary judgment on remand after trial despite district court having denied a pre-trial summary judgment motion prior to remand). Granting a second motion for summary judgment on one claim after a trial on separate claims is, therefore, appropriate when "the jury's subsequent verdict has rendered immaterial any disputes of fact that may have existed at the [pre-trial] summary-judgment stage." *Id.*

## DISCUSSION

Plaintiff's only remaining claim asserts malicious prosecution against Defendant Clark based on Section 1983. "To prevail on a malicious prosecution claim under . . . federal law, a plaintiff must show: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Kee v. City of New York*, 12 F.4th 150, 161–62 (2d Cir. 2021). Since Plaintiff has brought his malicious prosecution claim pursuant to Section 1983 rather than New York state law, he also "must demonstrate a sufficient post-arraignment liberty restraint." *Id.* at 162.

"Probable cause, in the context of malicious prosecution, has been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Id.*

8

at 166.  This is a slightly higher standard than the probable cause required to defeat a false arrest claim under Section 1983, which only requires the arresting officer to "ha[ve] knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Id.* at 158.  For a defendant successfully to invoke probable cause to defeat a claim for malicious prosecution, "probable cause must be shown as to each crime charged in the underlying criminal action."  *Id.* at 166.

## I.     Defendant Clark Had Probable Cause to Charge Plaintiff with OGA

Defendant Clark had probable cause to charge Plaintiff with OGA even according to Plaintiff's account of the events leading up to his arrest, and summary judgment dismissing Plaintiff's claim for malicious prosecution based on the OGA charge is therefore appropriate. The crime of OGA "requires one of the following:  (1) intimidation, (2) physical force or interference, or (3) any independently unlawful act."  *Dancy v. McGinley*, 843 F.3d 93, 111 (2d Cir. 2016).  "Any interference must be physical and must obstruct an official function authorized by law."  *Id.*  The Second Circuit has therefore held that probable cause to prosecute a plaintiff for OGA does not exist when the plaintiff simply refuses to answer police questions, *id.* at 112, or attempts orally to dissuade police officers from taking a particular action, *see Zellner v. Summerlin*, 494 F.3d 344, 376–77 (2d Cir. 2007) (holding that disputes of fact about whether plaintiff attempted physically to block traffic at protest site precluded defendants' post-trial motion that they were entitled to qualified immunity).  A plaintiff's incidental, unintended contact with a police officer is also insufficiently physical to trigger probable cause to charge the plaintiff with OGA.  *Barksdale v. Colavita*, 506 F. App'x 82, 85 (2d Cir. 2012) (reversing summary judgment in favor of defendants on malicious prosecution claim, without prejudice to district court finding qualified immunity at trial following the jury's resolution of disputed facts).

9

**SA 9**

Although a plaintiff's interference with a lawful governmental function must be "physical" in nature, a plaintiff can commit OGA by "physically interfer[ing]" with that governmental function without using "physical force." *Kass v. City of New York*, 864 F.3d 200, 209–10 (2d Cir. 2017) (granting judgment on the pleadings in favor of defendants, holding that their decision to arrest plaintiff for OGA was protected by qualified immunity). "[A]n officer may consider both words and deeds in determining whether the individual's conduct is sufficiently obstructive to justify an arrest" even though a plaintiff's obstructions "cannot consist solely of verbal statements." *Id.* at 209.

As mentioned above, Judge Weinstein previously denied Defendants' motion for summary judgment on several of Plaintiff's claims, including his claim for malicious prosecution. The denial of summary judgment on the malicious prosecution claim was based on the following chain of reasoning. First, Judge Weinstein held that there were disputes of fact about whether Defendants' warrantless entry into Plaintiff's apartment was justified by exigent circumstances—*i.e.*, a reliable allegation that child abuse was being committed inside. ECF No. 77 at 24–25. On that basis, Judge Weinstein denied summary judgment on Plaintiff's unlawful entry claim. *Id.* Second, Judge Weinstein explained that Defendants were not permitted to arrest Plaintiff for OGA unless Defendants had a lawful reason to enter his apartment. *Id.* at 25–26. The factual dispute about whether Defendants had a lawful reason to enter, therefore, required the denial of summary judgment on Plaintiff's false arrest claim. *Id.* Third, and finally, Defendants could not have had probable cause to charge Plaintiff with resisting arrest if their attempt to arrest him for OGA had been unlawful, and the charge for OGA would also have lacked probable cause if Defendants had no lawful reason to enter Plaintiff's apartment. *Id.* at 26–27.

**SA 10**

Accordingly, Judge Weinstein's denial of summary judgment on Plaintiff's malicious prosecution claim hinged on a single disputed issue—whether Defendants had a lawful reason to demand entry to Plaintiff's apartment. The jury resolved that question at trial by answering "NO," with respect to each Defendant, including Defendant Clark, to the question, "Did you find that a defendant unlawfully entered plaintiff's apartment?" ECF No. 137 at 1. Since the jury was considering a more expansive record than Judge Weinstein did on summary judgment and the jury's answer resolving this previously disputed issue was unambiguous, the Court defers to the jury's conclusion as the law of the case. *See Bradshaw*, 788 F. App'x at 759.

Having resolved the issue of whether Defendants were performing a lawful function when seeking to enter Plaintiff's apartment, the conclusion that Defendant Clark had probable cause to charge Plaintiff with OGA flows as a matter of law from Plaintiff's own account of the events leading to his arrest. As explained above, Plaintiff testified at trial that he physically blocked Defendants' path of entry to his apartment by standing in the door and refusing orally to let them enter. ECF No. 146-2 at 611–23. The Second Circuit has held that, when police officers have a lawful basis "to enter peoples' homes" to investigate potential child abuse, a plaintiff's refusal to open the door for those officers "[i]s *not* pure speech" and instead satisfies "the physical force or interference element of the obstructing governmental administration statute." *Shaheed v. Kroski*, 833 F. App'x 868, 870–71 (2d Cir. 2020) (emphasis in original) (affirming dismissal of malicious prosecution claim where officers' entry into plaintiffs' home was authorized by a "New York Family Court order[]"). Plaintiff's disputes about whether he used physical force against any Defendant or which party initiated the use of force, therefore, do not preclude summary judgment.

11

**SA 11**

Alternatively, even if Defendant Clark did not have probable cause to charge Plaintiff with OGA, he is entitled to qualified immunity based on Plaintiff's account of Plaintiff's interactions with Defendants. "An arresting officer is entitled to qualified immunity even if probable cause is lacking so long as arguable probable cause was present when the arrest was made." *Washington v. Napolitano*, 29 F.4th 93, 105 (2d Cir. 2022). "A police officer has arguable probable cause if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.*

Plaintiff was arrested and charged in January 2014. ECF No. 169 ¶¶ 1, 7. As of that time, the Second Circuit had held that a plaintiff's act of remaining in her locked car and refusing police instructions to exit the vehicle—without using any other means of physical force to impede the officers' work—would have given a reasonable officer probable cause to charge the plaintiff with OGA. *Lennon v. Miller*, 66 F.3d 416, 424–25 (2d Cir. 1995) (granting summary judgment in favor of defendants on false arrest and malicious prosecution claims based on qualified immunity). A district court within this Circuit had similarly held that police officers had probable cause to charge a plaintiff with OGA for refusing to follow police instructions to open his apartment door even though, once the officers had forced the door open, the plaintiff "was sitting on the couch with his feet on the coffee table watching television" and not using any physical force to impede the officers' entry. *Johnson v. City of New York*, No. 05-cv-7519, 2008 WL 4450270, at *10 (S.D.N.Y. Sept. 29, 2008) (granting summary judgment dismissing malicious prosecution claim). Based on this case law defining the circumstances under which an officer could have charged a person with OGA, officers of reasonable competence could have

12

concluded that Plaintiff's act of standing in his apartment doorway and insisting that Defendants were not permitted to enter rose to the level of OGA.

The fact that the parties dispute whether some of the facts included in Defendant Clark's complaint actually occurred—particularly whether Plaintiff used any physical force—does not preclude the Court from deciding that the undisputed facts would have established probable cause to charge Plaintiff with OGA. A police officer's "exaggerat[ion]" of disputed facts in a criminal complaint does not eliminate the probable cause to charge a plaintiff. *Soomro v. City of New York*, 739 F. App'x 51, 53–54 (2d Cir. 2018) (affirming summary judgment in favor of defendants on malicious prosecution claim). This is true even if the information that a police officer provides to prosecutors is potentially false, rather than a mere exaggeration. *See Frost v. N.Y. City Police Dep't*, 980 F.3d 231, 242–43 (2d Cir. 2020) (affirming summary judgment dismissing malicious prosecution claim, despite holding that the same allegedly false information precluded granting summary judgment to defendants on plaintiff's claim for denial of a right to fair trial). Similarly, the allegedly false facts in Defendant Clark's complaint do not preclude a finding that he is entitled to qualified immunity. *See Richardson v. McMahon*, No. 22-582-cv, 2023 WL 3102910, at *2 (2d Cir. Apr. 27, 2023) (holding that officer's alleged false statements did not deprive him of qualified immunity for malicious prosecution claim, although acknowledging that such statements may have supported a separate claim for denial of a right to a fair trial).

The alleged falsities in Defendant Clark's complaint were relevant to Plaintiff's claim for denial of Plaintiff's right to a fair trial, to which probable cause to charge Plaintiff was not a valid defense. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016) ("[A] Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of

false information to prosecutors can stand even if the officer had probable cause to arrest the Section 1983 plaintiff."); *Frost*, 980 F.3d at 250 ("[F]air trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims, and . . . therefore probable cause, which is a Fourth Amendment concept, should not be used to immunize a police officer who violates an arrestee's non-Fourth Amendment constitutional rights."). However, the jury decided in favor of Defendants on Plaintiff's fair trial claim, and Plaintiff did not challenge that aspect of the jury's verdict on appeal. *See* ECF No. 137.

Plaintiff focuses heavily on the fact that during the approximately one day between when he was arrested and when he was charged, Defendant Clark received evidence demonstrating that Plaintiff's child had not been abused. *See* ECF No. 168 at 16–17. It is true that "probable cause may dissipate" after an arrest if "the groundless nature of the charges is made apparent by the discovery of some intervening fact." *Moore v. City of New York*, 854 F. App'x 397, 399 (2d Cir. 2021) (affirming summary judgment dismissing malicious prosecution claim). However, the intervening fact must "show[] that the charges against the suspect are groundless." *Keyes v. City of New York*, No. 21-2406-cv, 2023 WL 176956, at *4 (2d Cir. Jan. 13, 2023) (affirming summary judgment dismissing malicious prosecution claim). Plaintiff was charged with OGA— not child abuse. The after-the-fact revelation that Plaintiff had not abused his child did not change the fact that exigent circumstances had justified the first responders' entry into his apartment the night before or that Plaintiff had physically impeded that entry. Therefore, the intervening facts that Plaintiff relies on did not dissipate the probable cause to charge Plaintiff with OGA and, additionally, do not defeat Defendant Clark's qualified immunity.

## II.     Plaintiff Has Failed to Demonstrate an Independent Deprivation of Liberty Associated with His Charge for Resisting Arrest

The fact that Defendant Clark had probable cause to charge Plaintiff with OGA does not, by itself, defeat Plaintiff's claim for malicious prosecution based on the second charge for resisting arrest.  When a plaintiff asserts a malicious prosecution claim after being charged with multiple offenses, the existence of probable cause to charge the plaintiff for one offense does not automatically defeat the malicious prosecution claim with respect to the other offense(s).  *See Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991) (holding that district court erred by "instruct[ing] that if the jury found probable cause supporting any of the three charges . . . lodged against [plaintiff], no liability for malicious prosecution could be found as to any of the charges filed").  The existence of probable cause to charge a plaintiff with a lesser offense does not "foreclose a malicious prosecution cause of action on charges requiring different, and more culpable, behavior."  *Id.*

The Court cannot separately conclude as a matter of law, based on undisputed facts, that Defendant Clark had probable cause to charge Plaintiff with resisting arrest.  Plaintiff testified that he did not resist in any way once Defendants initiated physical contact with him to gain entry to his apartment and make his arrest.  ECF No. 146-2 at 617:24–25, 619:10–16.  Therefore, even though no reasonable jury could conclude that Defendant Clark lacked probable cause to arrest and charge Plaintiff with OGA, a reasonable jury could conclude that once the officers began to arrest Plaintiff for OGA, he committed no separate act that gave Defendant Clark probable cause to charge Plaintiff with resisting arrest.

Plaintiff's malicious prosecution claim based on his resisting arrest charge fails, however, for the separate reason that he cannot prove a deprivation of liberty associated with that charge.  To prove a claim for malicious prosecution, Plaintiff "must demonstrate a sufficient post-

arraignment liberty restraint." *Kee*, 12 F.4th at 162. In applying this requirement, the Second Circuit has affirmed summary judgment dismissing a malicious prosecution claim because the purported restraints on the plaintiff's liberty that "resulted from the prosecution that he allege[d] was unsupported by probable cause" were independently attributable to separate charges "indisputably supported by probable cause." *Coleman v. City of New York*, 688 F. App'x 56, 58 (2d Cir. 2017). Multiple district courts within this Circuit have followed this rationale, and granted summary judgment in favor of defendants, by holding that a plaintiff cannot connect a restraint on liberty to one charge that might support a malicious prosecution claim if the plaintiff was charged with equal or lesser crimes for which a malicious prosecution claim fails.[2]

Both of the crimes with which Plaintiff was charged, OGA and resisting arrest, are Class A misdemeanors under New York law and, therefore, each subjected Plaintiff to potential punishment of the same magnitude. As in *Coleman*, Plaintiff "was released without bail after his arraignment," and the only deprivation of his liberty was his "ongoing requirement of appearing in court." *Coleman*, 688 F. App'x at 58; *see* ECF No. 169 ¶¶ 11–12. This restraint on Plaintiff's liberty would have occurred if Plaintiff had been charged with only OGA, a charge that was indisputably based on probable cause for the reasons explained above. As a result, even if there

---

[2]    *Othman v. City of New York*, No. 13-cv-4771, 2018 WL 1701930, at *14 (E.D.N.Y. Mar. 31, 2018) (plaintiff could not "disentangle the constitutionally permissible court appearances he made in conjunction" with charges for which there was probable cause "from any allegedly impermissible deprivations of liberty as a result of" separate charges that purportedly lacked probable cause); *Mortimer v. Wilson*, No. 15-cv-7186, 2020 WL 3791892, at *14 (S.D.N.Y. July 7, 2020) (order of protection that plaintiff relied upon as basis for restraint on liberty could have been entered based solely upon charges for which plaintiff's malicious prosecution claim failed); *Warner v. Freeman*, No. 14-cv-1192, 2017 WL 4227655, at *2–3 (D. Conn. Sept. 22, 2017) (court appearances that would have been required by other charges based on probable cause did not satisfy deprivation of liberty requirement).

was no probable cause to charge Plaintiff with resisting arrest, he suffered no additional deprivation of his liberty because of that charge.

## **CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendant Clark's motion for summary judgment dismissing Plaintiff's sole remaining claim for malicious prosecution in violation of 42 U.S.C. § 1983. *See* ECF No. 163. The Clerk of Court is respectfully directed to enter judgment in favor of Defendants based on a combination of this order and the jury's prior verdict in favor of the remaining Defendants, *see* ECF No. 137, and to close this case.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
May 18, 2023

17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
LARRY THOMPSON,

                Plaintiff,                       JUDGMENT

        v.                                       14-CV-07349 (HG) (RML)

PAGIEL CLARK,
                Defendant.
---------------------------------------------------------- X

A Memorandum and Order of Honorable Hector Gonzalez, United States District Judge,

having been filed on May 18, 2023, granting Defendant Clark's motion for summary judgment

dismissing Plaintiff's sole remaining claim for malicious prosecution in violation of 42 U.S.C. §

1983, See ECF No. 163; it is

ORDERED and ADJUDGED that Defendant Clark's motion for summary judgment

dismissing Plaintiff's sole remaining claim for malicious prosecution in violation of 42 U.S.C. §

1983, is granted, *See* ECF No. 163; that judgment is hereby entered in favor of Defendants; that

Larry Thompson recovers zero dollars ($0) from Defendants Clark, Montefusco, Bouwmans, and

Romano; and that Defendants recover no costs or fees from the Plaintiff Larry Thompson.

Dated: Brooklyn, NY                               Brenna B. Mahoney
        May 23, 2023                         Clerk of Court

                                      By: */s/Jalitza Poveda*
                                         Deputy Clerk

**SA 18**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LARRY THOMPSON, | **AMENDED MEMORANDUM & ORDER** |
| Plaintiff, | 14-CV-7349 |
| – against – | |
| Police Officer PAGIEL CLARK, Shield #28742; Police Officer PAUL MONTEFUSCO, Shield #10580; Police Officer GERARD BOUWMANS, Shield # 2102; Police Officer PHILLIP ROMANO, Shield #6295, | |
| Defendants. | |

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 2 6 2018 ★
**BROOKLYN OFFICE**

**JACK B. WEINSTEIN, Senior District Judge:**

| **Parties** | **Counsel** |
|---|---|
| Larry Thompson | David Zelman<br>612 Eastern Parkway<br>Brooklyn, NY 11225 |
| Pagiel Clark<br>Paul Montefusco<br>Gerard Bouwmans<br>Phillip Romano | Kavin Thadani<br>New York City Law Department<br>100 Church Street<br>New York, NY 10007 |
| | Matthew Bridge<br>New York City Law Department<br>100 Church Street<br>New York, NY 10007 |



1

SA 19

Table of Contents

I.    Introduction ................................................................................................. 3

    A.    Charges ................................................................................................. 5

    B.    Motions for Summary Judgment ......................................................... 5

    C.    Trial ..................................................................................................... 5

II.   Facts ............................................................................................................ 6

III.  Law .............................................................................................................. 8

    A.    Summary Judgment .............................................................................. 8

    B.    Unlawful Entry of Home ...................................................................... 9

    C.    False Arrest ......................................................................................... 10

    D.    Malicious Prosecution ........................................................................ 10

    E.    Denial of Right to Fair Trial .............................................................. 11

    F.    Spoliation ............................................................................................ 12

    G.    Personal Involvement ......................................................................... 12

    H.    Qualified Immunity ............................................................................ 13

        i.    Application of Current Law ........................................................ 14

        ii.   Policy Justifications ................................................................... 17

        iii.  Legal Precedent .......................................................................... 19

        iv.   Future Reliance on Qualified Immunity .................................... 21

IV.   Application of Law to Facts ...................................................................... 24

    A.    Unlawful Entry of a Home .................................................................. 24

    B.    Unlawful Arrest .................................................................................. 25

    C.    Malicious Prosecution ........................................................................ 26

    D.    Denial of Right to Fair Trial .............................................................. 27

    E.    Spoliation ............................................................................................ 27

    F.    Officer Bertram's and Rodney's Personal Involvement .................... 28

V.    Conclusion ................................................................................................. 28

2

**SA 20**

I.    Introduction

What shall a "good citizen," or a "good police officer," do when the United States Constitution tells them one thing and their common sense another?

Plaintiff alleges he was beaten by New York City Police Department ("NYPD") officers when he refused them entry into his home without a warrant. Defendant police officers argue that a report of child abuse provided exigent circumstances allowing their warrantless entry.

Larry Thompson ("Thompson" or "Plaintiff") is a "good citizen." He is a veteran of the United States Navy. He works as a supervisor for the United States Postal Service. He lives with his wife and two children. His reputation in the community is good.

Plaintiff's claim presents the question: what should a "good citizen," who committed no crime, do when confronted by "good police" trying to force their way into his home without a warrant to investigate a child abuse allegation? As explained by professor Robert Capers, the Supreme Court instructs the "good citizen" to waive his or her constitutional right to avoid invasion:

> *the good citizen should not hesitate to open his bag, pocket, or home to the police, or to otherwise consent to a search.* Such consensual searches, after all, will aid the police in doing their work. It will also enhance the citizen's safety and the safety of those around him. And of course, while even good citizens have a privilege against self-incrimination, and while of course the burden of proof always remains with the government, good citizens, if wrongly accused of a crime, will immediately present themselves to the authorities to prove their innocence. And if in the unusual event a good citizen in fact commits a crime-- perhaps it was a malum prohibitum crime—the good citizen will go a step further and admit his wrongdoing and accept his punishment. And lastly, should the good citizen for some reason find it absolutely necessary to assert his rights, such as his right to an attorney, he will assert those rights unambiguously to distinguish himself from other citizens who lack "linguistic skills."

I. Bennett Capers, *Criminal Procedure and the Good Citizen*, 118 Colum. L. Rev. 653, 663–64 (2018) (internal citations omitted); *see also Miranda v. Arizona*, 384 U.S. 436, 477–78 (1966)

("It is an act of responsible citizenship for individuals to give whatever information they may

have to aid in law enforcement.").

From a strict constitutional view, however, an occupant has no obligation to answer or

even open his door. He has the right to stay inside and remain silent.

> When law enforcement officers who are not armed with a warrant knock on a
> door, they do no more than any private citizen might do. And whether the person
> who knocks on the door and requests the opportunity to speak is a police officer
> or a private citizen, the occupant has no obligation to open the door or to speak . .
> . And even if an occupant chooses to open the door and speak with the officers,
> the occupant need not allow the officers to enter the premises and may refuse to
> answer any questions at any time.

*Kentucky v. King*, 563 U.S. 452, 469–70 (2011).

Despite this instruction from the Court to protect the constitutional requirement of a

warrant, failure to answer or open a door is often viewed by police, society, and sometimes

courts, as a reason for suspicion, justifying a finding of exigency. Alexander C. Ellman, *The*

*Emergency Aid Doctrine and 911 Hang-Ups: The Modern General Warrant*, 68 Vand. L. Rev.

919, 945 (2015) ("Officers now frequently refer to a homeowner's refusal to allow officers into

the home as evidence that an emergency exists. Likewise, the police often cite an occupant's

refusal to answer the door as evidence of an emergency.").

Here, defendants claim they were justified in breaking in by the exigency of an ongoing

possible threat to a child's safety. *See Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir.

2003). Disputed issues of fact remain. A jury determination is necessary to answer the mixed

question of fact and law: whether the officers were confronted by a need so urgent as to offset

the constitutional mandate of a warrant to enter a home. *Payton v. New York*, 445 U.S. 573, 586

(1980).

4

Qualified immunity is denied. Its grant, in the instant case, would be inconsistent with the purpose of 42 U.S.C. § 1983. "[Section] 1983 was [created] to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972). Courts should be encouraged and "allowed to play their historic role as the guardians of constitutional rights, not prohibited from doing so by a judiciary that elevates its concern for comity above the constitutional rights to which all persons are entitled." Stephen R. Reinhardt (late Judge of the Court of Appeals for the Ninth Circuit), *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113 Mich. L. Rev. 1219, 1253 (2015). The courts, police, and public, will benefit from a clarifying jury decision in this often replicated situation.

A. Charges

Plaintiff, in his amended civil complaint, alleges: (1) unlawful entry; (2) false arrest; (3) excessive force; (4) malicious prosecution; (5) denial of right to a fair trial; (6) failure to intervene; and (7) denial of medical treatment.

He has abandoned his claim of denial of medical treatment and all those against Officer Warren Rodney. He has not waived his claim of excessive force.

B. Motions for Summary Judgment

Plaintiff moves for summary judgment on claims for (1) unlawful entry and (2) false arrest. His motion is denied.

Defendants move for summary judgment on claims for: (1) unlawful entry; (2) false arrest; (3) malicious prosecution; (4) denial of right to a fair trial; and (5) all claims against defendant Bertram. Defendants' motion is granted only on the claims against Sergeant Bertram.

C. Trial

5

SA 23

The following claims shall proceed to trial: (1) unlawful entry against Officers Bouwmans, Romano, Clark and Montefusco; (2) false arrest against Officers Bouwmans, Romano, Clark and Montefusco; (3) excessive force against Officers Bouwmans, Romano, Clark and Montefusco; (4) malicious prosecution against Officer Clark; (5) denial of a right to a fair trial against Officer Clark; and (6) failure to intervene against Officers Bouwmans, Romano, Clark and Montefusco.

II.    Facts

At about 10:00 p.m., on the night of January 15, 2014, Camille Watson ("Watson") called 911. Defendants' Rule 56.1 Statement, ECF No. 45-1, Jan. 20, 2017, at ¶ 1 ("Defs.' 56.1"); *see also* I/NetDispatcher—Event Chronology—D14011523758, Thadani Declaration, Ex. A, ("Sprint Report") at 1. She reported that her two-week old niece was being abused by the baby's father at 399 Lincoln Place, Apartment 2E, in Brooklyn. *Id.* Watson did not state that the abuse was currently occurring, only that she had seen red rashes on her niece's buttocks area. Plaintiff's Rule 56.1 Statement, ECF No. 54, Apr. 7, 2017, at ¶ 2 ("Pls.' 56.1"); Sprint Report at 1. She identified the father as a 41 year-old black male, roughly five feet five inches tall, and 150 pounds. Sprint Report at 1.

Thompson lived with his fiancé (now his wife), son, and one-week old daughter. Plaintiff's Motion for Summary Judgment, ECF No. 56, Apr. 7, ("Pls.' Summ. J.") Ex. B, Thompson Dep. 8:14-16. Watson, his sister in law, suffered—and showed objective signs of— mental illness; she was temporarily living with plaintiff's family. *Id.* 15:10-22; *see also* Pls.' Summ. J., Ex. D, Watson Decl.

Two Emergency Medical Technicians ("EMTs") were directed to the scene by radio to investigate reported child abuse. Pls.' Summ. J., Ex. D, Dillahunt Dep. 9:1-25. They were met

6

**SA 24**

by a female, later identified as Watson, who asked the EMTs to follow her "upstairs." *Id.* 13:10-20. Watson did not provide any further corroboration to the EMTs at the scene. *Id.* They thought Watson appeared "strange" that "she did not look like she was right in her mind" and that she may have had a "learning disability." *Id.* 17:3-11; Pls.' Summ. J., Ex. E, Marturano Dep. 15:1-13. They followed Watson into apartment 2E. *Id.* The EMTs were confronted and asked to leave by plaintiff Thompson. *Id.* 21:8-25. They left the building. *Id.* 22:8-10.

Police Officers Pagiel Clark, Paul Montefusco, Gerard Bouwmans, and Phillip Romano received a radio direction to respond to the scene and investigate a report of "possible child abuse." Pls.' Summ. J., Ex. F, Montefusco Dep. 19:21-25. The EMTs informed the arriving officers that they had a "report of a child being abused" and they needed to "check the baby out." Dillahunt Dep. 45:1-25.

Defendant officers knocked on the door of apartment 2E and Thompson answered. Pls.' Summ. J., Ex. B, Thompson Dep. 26:17-18. His fiancé was inside the apartment with their children. *Id.* 37:7-12. She was dressed "in her underwear and a t-shirt." *Id.* The officers told Thompson that they needed to enter the apartment. *Id.* 37:20-24. He responded "[n]ot without a search warrant. I don't agree to you[] coming in without one." *Id.* 38:11-13.

Officer Montefusco attempted to cross the threshold of the apartment. Montefusco Dep. 47:1-4. Thompson blocked his path, and the officers placed him under arrest. *Id.* Thompson alleges that he did not resist, but that Officer Monetufusco threw him to the floor and began to choke him, while the other officers kicked and punched him. Thompson Dep. 38:15-20. Defendants claim that he resisted arrest by "flail[ing] [his] arms preventing [the officers] from placing handcuffs on the defendant." *See* Pls.' Summ. J., Ex. A, Crim. Ct. Compl.

7

SA 25

The officers entered the apartment along with the EMTs. Thompson Dep. 38:15-20. The EMTs observed red marks on the baby's buttocks but determined, after taking the child to a hospital, that these were caused by a diaper rash. Dillahunt Dep. 25:1-25. Thompson informed the officers that earlier that day he had taken his new born daughter to her first doctor's "appointment [since] being born." Thompson Dep. 17:4-16.

Thompson was transported in a police patrol car to the seventy-seventh precinct. *Id.* 61:7. He requested medical attention for back and neck pain, and was brought by the officers to Interfaith Hospital. *Id.* 66:21-67:17. An x-ray showed swelling, but no permanent injury. *Id.* 69:10-15. Pain medication and a neck brace were prescribed. *Id.* 69:16-25. He was returned by the police to the seventy-seventh precinct and then to Brooklyn Criminal Court. *Id.* 71-72.

Thompson was arraigned on January 17, 2014, on charges of NYPL § 195.05, Obstructing Governmental Administration in the Second Degree, and NYPL § 205.30, Resisting Arrest. *See* Pls.' Summ. J., Ex. A, Crim. Ct. Compl. He had been held in custody for two days. He was released on his own recognizance; after three court appearances, the case against him was dismissed on motion of the Brooklyn District Attorney. Thompson Dep. 73:13-19. Thompson was never charged with child abuse.

III. Law

A. Summary Judgment

Summary judgment will be granted unless there exists disputed "facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The court is required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003).

8

**SA 26**

### B.  Unlawful Entry of Home

The Fourth Amendment protects the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. *Arizona v. Evans*, 514 U.S. 1 (1995).  Searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980).

One exception to the warrant requirement is the presence of exigent circumstances. *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1991).  The primary inquiry in determining whether exigent circumstances justify a warrantless entry is whether law enforcement agents are "confronted by an urgent need to render aid or take action." *Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003).  Police officers may enter a dwelling without a warrant to render emergency aid to a person whom they reasonably believe to be in distress and in need of assistance. *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (internal citation omitted).  They may do this if, based on the totality of the circumstances known to the investigating officers at the time of entry, it was "objectively reasonable" for them to do so. *Id.*  "Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  The government carries a "heavy burden" in establishing the presence of this exception and rebutting the presumptive unreasonableness of a warrantless search. *See, e.g., Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

In the context of possible child abuse, the state has a "profound interest in the welfare of the child, particularly in his or her being sheltered from abuse." *Hurlman v. Rice*, 927 F.2d 74, 80 (2d Cir. 1991) (internal citation omitted).  The "mere possibility" of child abuse is insufficient

9

grounds for state intervention; law enforcement agents must have an objectively reasonable basis to believe that danger to the child is imminent. *Id.* at 81.

Anonymous or uncorroborated 911 calls cannot alone justify the warrantless entry of a home. *Kerman v. City of New York*, 261 F.3d 229, 238 (2d Cir. 2001).

### C. False Arrest

An arrest without probable cause constitutes a false arrest and thus a violation of the Fourth Amendment. *See Arizona v. Hicks*, 480 U.S. 321 (1987). "The test to be applied in determining whether probable cause existed for an arrest is whether the facts available to the officers at the moment of the arrest were sufficient to warrant a prudent [officer] in believing that the [defendant] had committed . . . an offense." *U.S. ex rel. LaBelle v. LaVallee*, 517 F.2d 750, 753 (2d Cir. 1975) (internal quotation omitted). In determining the validity of an arrest, the court looks to the applicable state law as it pertains to the offense at issue, in this case the law of the State of New York. *See Ker v. California*, 374 U.S. 23, 37 (1963).

### D. Malicious Prosecution

A plaintiff seeking to establish a claim for malicious prosecution must prove: (1) the initiation or continuation of a state criminal proceeding; (2) termination of the state criminal proceeding in plaintiff's favor; (3) lack of probable cause; (4) actual malice by the defendant; and (5) an independent deprivation of liberty. *See Murphy v. Lynn,* 118 F.3d 938, 944-47 (2d Cir. 1997).

If a plaintiff is required to appear or be held on other criminal charges supported by probable cause, and of equal or greater magnitude, a claim of malicious prosecution will not stand. *Coleman v. City of New York,* 688 Fed. Appx. 56, 58 (2d Cir. 2017); *see also Flynn-Rodriguez v. Cheng*, No. 14-CV-2287, 2017 WL 3278889, at *2 (E.D.N.Y. Aug. 1, 2017).

E. Denial of Right to Fair Trial

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors to aid prosecution, he or she violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). An individual suffers a constitutional violation of the Sixth Amendment's right to fair trial if: (1) an official; (2) fabricates evidence that; (3) is likely to influence a jury; (4) forwards that information to prosecutors knowing it is false; and (5) the plaintiff suffers a deprivation of liberty as a result. *See Jovanovic v. City of New York*, 486 Fed. App'x 149, 152 (2d Cir. 2012). A plaintiff is not required to proceed to trial in order to have an actionable § 1983 claim based on the denial of this right. *See Ricciuti*, 124 F.3d at 127. The claim may accrue when fabricated information is forwarded to a prosecutor and results in a deprivation of defendant's liberty. *Id.* at 130.

The falsified evidence need not be the sole or continous reason the plaintiff was deprived of liberty. *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016) ("[E]ven though the arrest . . . was supported by probable cause, and therefore a privileged arrest accounted for at least some portion of the deprivation of his liberty, the [plaintiff] nevertheless . . . suffered a deprivation of liberty as a result of the officer's fabrication of a false confession."). The deprivation prong may be satisfied even if an officer had probable cause to make an arrest on another charge.

> The setting of bail, which may make the difference between freedom and confinement pending trial, and the prosecutor's decision to pursue charges rather than to dismiss the complaint without further action, may depend on the prosecutor's and magistrate's assessments of the strength of the case, which in turn may be critically influenced by fabricated evidence. Thus, a further deprivation of

11

liberty can result from the fabrication of evidence even if the initial arrest is lawful.

*Garnett,* 838 F.3d at 277.

Qualified immunity is unavailable on "a claim for denial of the right of a fair trial where the claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find." *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015).

F. Spoliation

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A plaintiff seeking an adverse inference or other remedies for spoliation must prove: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

G. Personal Involvement

Personal involvement of a defendant "in [an] alleged constitutional deprivation[] is a prerequisite to an award of damages under § 1983." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation omitted). A supervisor's personal involvement may be shown through "evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4)

12

SA 30

the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." *Id.*

## H. Qualified Immunity

Qualified immunity has recently come under attack as over-protective of police and at odds with the original purpose of section 1983: "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992); *see* Jon O. Newman, *Here's a Better Way to Punish the Police: Sue Them for Money,* Washington Post, Jun. 23, 2016.

The Court's expansion of immunity, specifically in excessive force cases, is particularly troubling. As stated by one frequent defender of constitutional rights:

> The Supreme Court's decision [in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018)] serves to expand qualified immunity for police officers to an unprecedented and dangerous degree, becoming, as Justice Sotomayor aptly noted in her dissent, 'an absolute shield for law enforcement officers' and 'gutting the deterrent effect of the Fourth Amendment.' As the nation continues to mourn the recent deaths of [citizens] at the hands of police, we remain concerned that this ruling will undermine efforts to hold law enforcement officers accountable for their use of excessive force, which has led to the tragic loss of too many innocent lives.

NAACP LDF, *Statement on U.S. Supreme Court Decision Expanding Qualified Immunity for Police*, Apr. 2, 2018.

The legal precedent and policy justifications of qualified immunity, it has been charged, fail to validate its expansive scope. The law, it is suggested, must return to a state where some effective remedy is available for serious infringement of constitutional rights. *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) ("This decision is not just wrong on the law; it also sends an alarming signal to law enforcement officers and the public. It tells . . . the public [and officers] that palpably unreasonable conduct will go unpunished.").

i.   Application of Current Law

Qualified immunity, as it stands, protects "all but the plainly incompetent." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation omitted).  Police officers are immune from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

This rule is grounded in the belief that officers should be protected from reasonable mistakes, but not allowed to act in clear violation of constitutional law.

> Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citation omitted).

The doctrine, historically, provided no immunity to officers who intentionally subverted the law or acted with malicious intent. *See Harlow,* 457 U.S. at 815 ("[Q]ualified immunity would [traditionally] be defeated if an official . . . took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury.") (emphasis in original). *Harlow*, however, expanded immunity to any conduct that is not in violation of a "clearly established" law, regardless of whether the official acted in good or bad faith. *Id.* at 818.

The change in the law means that even officers who intentionally or maliciously flout the Fourth Amendment are immune from suit if their actions were "objectively reasonable."  For example, in *Mullenix v. Luna*, 136 S. Ct. 305, 316 (2015), the Supreme Court granted qualified immunity to a state trooper who fired six rounds at a car that had led police on a chase and was traveling at 85 miles per hour.  The shots killed the driver.  *Id.*  They were fired "less than a

14

SA 32

second before the car hit spike strips deployed to stop it." *Id.* In a dissent, Justice Sotomayor discussed the Court's inability to examine the subjective intent of the officer:

> When Mullenix confronted his superior officer after the shooting, his first words were, "How's that for proactive?" (Mullenix was apparently referencing an earlier counseling session in which [his superior officer] suggested that he was not enterprising enough.). The glib comment does not impact our legal analysis; an officer's actual intentions are irrelevant to the Fourth Amendment's "objectively reasonable" inquiry. But the comment seems to me revealing of the culture this Court's decision supports when it calls it reasonable—or even reasonably reasonable—to use deadly force for no discernible gain and over a supervisor's express order to "stand by." By sanctioning a "shoot first, think later" approach to policing, the Court renders the protections of the Fourth Amendment hollow.

*Mullenix*, 136 S. Ct. at 316 (Sotomayor, J., dissenting) (internal citation omitted).

This evolution in the law has also affected the current procedure in which courts analyze constitutional claims. *Saucier v. Katz,* 533 U.S. 194 (2001) required district courts to first determine whether a constitutional violation had occurred, and if so, proceed to determine whether the law was "clearly established" at the time. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) rejected *Saucier*, allowing courts to grant qualified immunity without analyzing whether or not a constitutional violation had occurred, but solely on the finding that the right at issue was not "clearly established." If the law is not "clearly established," an officer's actions, the Court assumes, can only be reasonable.

This approach has led to decisions like *Mullenix*, where the Court declined to address the question of whether a plaintiff's constitutional rights were violated, but decided only if the right was "clearly established." 136 S. Ct. at 308 ("We address only the qualified immunity question, not whether there was a Fourth Amendment violation in the first place, and now reverse."). The majority in *Mullenix* relied solely on the finding that it was not "beyond debate" that the officer had acted unreasonably in shooting the fleeing suspect. *Id.* at 309. The constitutional question, was therefore irrelevant.

SA 33

The failure to address whether or not an act was constitutional prevents the creation of "clearly established" law needed to guide law enforcement and courts on narrow issues not yet decided by the Supreme Court.

> [E]ven the most egregious official actions will further tempt courts to ignore important constitutional questions and, instead, to assume that the current Court will rarely, if ever, reverse a grant of qualified immunity. The failure to identify constitutional violations allows government officials and law enforcement officers to continue their unconstitutional practices secure in the knowledge that they cannot be called to account for their actions. While *Saucier* ensured that even when qualified immunity applied in a particular case, federal courts would provide remedies for victims of unconstitutional law enforcement practices in future cases, *Pearson* secures precisely the opposite end. At a time in which it is vital for constitutional law to keep pace with changes in technology, social norms, and political practices, this trend toward granting immunity while failing to articulate constitutional rights will surely have far-reaching, negative repercussions.

Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113 Mich. L. Rev. 1219, 1250 (2015); Lindsey de Stefan, *How Qualified Immunity Reform Could Create Accountability and Curb Widespread Police Misconduct*, 47 Seton Hall L. Rev. 543, 566 (2017) ("Some officers are escaping liability simply because of the Court's repeated failures to establish consistency and clarity in its qualified immunity jurisprudence . . . the Court [should] use[] qualified immunity opinions to demonstrate what qualifies as a clearly established right by meticulously outlining its reasoning in answering whether a set of facts implicates such a right."); *but cf. Simon v. City of New York*, No. 17-1281, 2018 WL 3059387, at \*1 --- F.3d ---- (2d Cir. June 21, 2018) (denying qualified immunity in "an uncommon obvious case in which the unlawfulness of the defendants' conduct is sufficiently clear even though existing precedent does not address similar circumstances.") (internal quotation marks and alterations omitted).

16

SA 34

ii.   Policy Justifications

The Supreme Court's policy justifications for qualified immunity have evolved over time. Consistently lurking in the background is the threat of financial cost to government officials. This was first explicitly cited in *Pierson v. Ray*, 386 U.S. 547, 555 (1967). The Court granted qualified immunity to police officers in the belief that if it was not granted police might be disinclined to perform their duty. "A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does." *Id.* This concern is misdirected when focused on individual police officers because they are "virtually always indemnified." Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885 (2014) ("Governments paid approximately 99.98% of the dollars that plaintiffs recovered in lawsuits alleging civil rights violations by law enforcement. Law enforcement officers in my study never satisfied a punitive damages award entered against them."); *see also* Lynn Adelman, *The Supreme Court's Quiet Assault on Civil Rights*, Dissent Magazine, Fall 2017 (thoroughly analyzing the Supreme Court's policy justifications for qualified immunity).

After *Pierson*, the Court explained that the policy justifications of qualified immunity were not limited solely to damages against individual officers, but included broader "social costs," such as:

> the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.

*Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982) (internal citation omitted). The Court partly relied on the burden of "unnecessary litigation" to encourage district courts to skip the

17

constitutional question and decide only whether a right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("Unnecessary litigation of constitutional issues also wastes the parties' resources. Qualified immunity is an immunity from suit rather than a mere defense to liability. *Saucier*'s two-step protocol disserve[s] the purpose of qualified immunity when it forces the parties to endure additional burdens of suit—such as the costs of litigating constitutional questions and delays attributable to resolving them—when the suit otherwise could be disposed of more readily.") (internal citation omitted).

Citing qualified immunity as a remedy for social costs and the burdens of litigation may, some academics believe, be misguided. As Professor Schwartz puts the matter:

> [Q]ualified immunity may actually increase the costs and delays associated with
> Section 1983 litigation. Although qualified immunity terminated only 3.9% of the
> 979 cases in my dataset in which qualified immunity could be raised, the defense
> was in fact raised by defendants in more than 37% of these cases--and was
> sometimes raised multiple times, at the motion to dismiss stage, at summary
> judgment, and through interlocutory appeals. *Each time qualified immunity is
> raised, it must be researched, briefed, and argued by the parties and decided by
> the judge.* And litigating qualified immunity is no small feat. John Jeffries
> describes qualified immunity doctrine as "a mare's nest of complexity and
> confusion." Lower courts are "hopelessly conflicted both within and among
> themselves" as a result. One circuit court judge reported that "[w]ading through
> the doctrine of qualified immunity is one of the most morally and conceptually
> challenging tasks federal appellate court judges routinely face."
>
> The time and effort necessary to resolve qualified immunity motions could
> nevertheless further the goals of qualified immunity doctrine if it effectively
> protected defendants from discovery and trial. But in the five districts in my
> study, just 8.6% of qualified immunity motions brought by defendants in my
> docket dataset resulted in case dismissals. The remaining 91.4% of qualified
> immunity motions brought by defendants required the parties and judges to
> dedicate time and resources to briefing, arguing, and deciding the motions without
> shielding defendants from discovery and trial.

Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2, 60–61 (2017) (emphasis added). In the cases where qualified immunity was granted, it was most often done at the

18

summary judgment stage, meaning that it still failed to "shield government officials" because of the extensive fact discovery required to litigate a motion for summary judgment. *Id.* at 49.

Qualified immunity may be motivated by a greater desire to generally prevent lawsuits against public officials, or to shield governments themselves from costs, but the Supreme Court has never openly expressed this rationale. *Id.* at 50 ("Available evidence suggests that just 1% of people who believe they have been harmed by the police file lawsuits against law enforcement."); *see also* Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity,* 113 Mich. L. Rev. 1219, 1245–46 (2015) ("As law enforcement officers benefit from qualified immunity, so do municipalities, indirectly, because indemnification agreements would otherwise force them to pay the damages for which the officers have been held responsible; in fact, when officers receive the benefit of qualified immunity, it is in reality the municipality that is relieved of its duty to compensate the victim of a constitutional violation.").

iii.   Legal Precedent

The legal precedent for qualified immunity, or its lack, is the subject of intense scrutiny. *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("As I have observed earlier, our treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume.").

Six years after *Monroe v. Pape*, 365 U.S. 167 (1961) expanded the protections of 42 U.S.C. § 1983, the Court began narrowing its influence through imposition of qualified immunity by way of a common law good faith defense. In *Pierson v. Ray*, 386 U.S. 547, 557 (1967), the Court ruled "that the defense of good faith and probable cause, which the Court of

19

SA 37

Appeals found available to the officers in the common-law action for false arrest and

imprisonment, is also available to them in the action under [§] 1983." One criticism of this

application is that the common law did not allow for a general good faith defense. It only

applied if embedded in specific elements of intentional torts. *See Myers v. Anderson*, 238 U.S.

368, 378–79 (1915) (rejecting a good faith defense in a section 1983 case claiming

discrimination in voting); *see also Wyatt v. Cole*, 504 U.S. 158, 172 (1992) ("[I]t is something of

a misnomer to describe the common law as creating a good-faith *defense;* we are in fact

concerned with the essence of the wrong itself, with the essential elements of the tort.").

As professor William Baude has explained, the lack of a "freestanding" common law

good faith or immunity defense is significant, because:

> an element of a specific tort does not provide evidence of a more general
> backdrop that one would expect to export to other claims, let alone from common
> law to constitutional claims. For instance, a Fourteenth Amendment
> antidiscrimination claim requires the plaintiff to demonstrate discriminatory intent
> by the defendant. But it does not follow that intent—let alone discriminatory
> intent—is an element of a due process claim. Similarly, bad faith and flagrancy
> were simply elements of certain torts brought against public officials. It did not
> follow that they were elements of all torts or all constitutional claims against
> public officials.

William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 59 (2018).

Common law origin has remained a key justification of qualified immunity, even as the

standard for official immunity has changed from good faith to objective reasonableness. *See*

*Anderson v. Creighton*, 483 U.S. 635, 645 (1987) ("[In *Harlow*] the Court completely

reformulated qualified immunity along principles not at all embodied in the common law,

replacing the inquiry into subjective malice so frequently required at common law with an

objective inquiry into the legal reasonableness of the official action."). Although the Court is no

longer constrained by a common law good faith defense, it continues to rely on the common law

as precedent for granting immunity. Ilan Wurman, *Qualified Immunity and Statutory*

**SA 38**

*Interpretation*, 37 Seattle U. L. Rev. 939, 965 (2014).  The shifting paradigm, unexplained by historical or legal precedent, has led some to argue that the Court has strayed from its assertion in *Tower v. Glover*, 467 U.S. 914, 922-23 (1984) that it does "not have a license to establish immunities from § 1983 actions in the interests of what we judge to be sound public policy."

Justice Scalia, fully dismissing common law precedent, opined that the Court had no duty to rely on legal justifications for qualified immunity, but should in fact pare it down, because, for policy reasons, he believed *Monroe v. Pape* improperly expanded section 1983:

> *Monroe* changed a statute that had generated only 21 cases in the first 50 years of its existence into one that pours into the federal courts tens of thousands of suits each year, and engages this Court in a losing struggle to prevent the Constitution from degenerating into a general tort law . . . Applying normal common-law rules to the statute that *Monroe* created would carry us further and further from what any sane Congress could have enacted.

> We find ourselves engaged, therefore, in the essentially legislative activity of crafting a sensible scheme of qualified immunities for the statute we have invented—rather than applying the common law embodied in the statute that Congress wrote.

*Crawford-El v. Britton*, 523 U.S. 574, 611 (1998).

### iv.  Future Reliance on Qualified Immunity

The Supreme Court's recent emphasis on shielding public officials and federal and local law enforcement means many individuals who suffer a constitutional deprivation will have no redress; state governments are protected by sovereign immunity and municipalities are not liable under *Monell* unless individual liability can be first proven. *See, e.g., Cordero v. City of New York*, 282 F. Supp. 3d 549, 557 (E.D.N.Y. 2017) ("The first phase will be against the officer defendants, the second phase on the *Monell* issue will only need to go forward if the jury finds against the individual defendants in the first phase.").

Courts should, when reasonable, follow *Saucier's* guidance to first analyze whether a constitutional violation occurred, instead of skipping to whether the right at issue was "clearly

**SA 39**

established." The failure to first address the constitutional question is an avoidance of the court's "essential function of explaining and securing the protections of the Constitution by failing to inform law enforcement officers, among others, which practices are constitutional and which are not." Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113 Mich. L. Rev. 1219, 1249 (2015); Michael Silverstein, *Rebalancing Harlow: A New Approach to Qualified Immunity in the Fourth Amendment*, 68 Case W. Res. L. Rev. 495, 522 (2017) ("Now, free from *Saucier*, overworked judges may want to take the "short route" instead of dealing with the merits of a case. This creates future costs. Judges constantly taking the easy way out in one area of the law creates a situation where 'civil rights questions go repeatedly unanswered.' This becomes a cycle where a constitutional violation need not be answered 'because the law is unclear and the law is unclear because the violation continues to go unaddressed.'") (internal citations omitted).

Turning to the application of qualified immunity, courts should, it has been suggested, return to the standard expressed in *Hope v. Pelzer*, 536 U.S. 730 (2002), and define "clearly established law" at a "high level of generality." The key inquiry being whether officers are on "notice their conduct is lawful." *Hope*, 536 U.S. at 730 (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). This allows courts to recognize "obvious" constitutional violations, even if not yet specifically outlawed in a prior Supreme Court ruling. Such a standard is vital in a rapidly changing society, where any willing judge or jurist may distinguish precedent as not "clearly established" because of slightly differing facts.

In *Hope*, 536 at 735, the Eleventh Circuit Court of Appeals affirmed a district court ruling granting qualified immunity for guards who had handcuffed an incarcerated plaintiff to a "hitching post" for a "7-hour period, [in which] he was given water only once or twice and was

22

given no bathroom breaks." The district court bypassed the constitutional question and found the

established law was unclear entitling the guards to immunity. *Id.* The Circuit Court found an

Eight Amendment violation but affirmed the district court, ruling:

> the federal law by which the government official's conduct should be evaluated
> must be preexisting, obvious and mandatory, and established, not by abstractions,
> but by cases that are materially similar to the facts in the case in front of us.

*Id.* at 736 (internal citation omitted).

The Supreme Court overruled the Eleventh Circuit finding the officers had fair warning,

even in this *"novel circumstance"* that their treatment of the plaintiff was unconstitutional. *Id.* at

741 (emphasis added). This conclusion justly balanced the need to redress constitutional wrongs

and shield officers when they act reasonably. The Court in *Hope* relied on case precedent and

reports from the DOJ specifically advising against use of the hitching post:

> The obvious cruelty inherent in this practice should have provided respondents
> with some notice that their alleged conduct violated Hope's constitutional
> protection against cruel and unusual punishment. Hope was treated in a way
> antithetical to human dignity—he was hitched to a post for an extended period of
> time in a position that was painful, and under circumstances that were both
> degrading and dangerous. This wanton treatment was not done of necessity, but as
> punishment for prior conduct. Even if there might once have been a question
> regarding the constitutionality of this practice, the Eleventh Circuit precedent
> of *Gates* and *Ort,* as well as the DOJ report condemning the practice, put a
> reasonable officer on notice that the use of the hitching post under the
> circumstances alleged by Hope was unlawful. The "fair and clear warning," that
> these cases provided was sufficient to preclude the defense of qualified immunity
> at the summary judgment stage.

*Id.* 745–46 (internal citations omitted).

As explained by the late Judge Stephen Reinhardt of the United States Court of Appeals

for the Ninth Circuit, the *Hope* standard of providing notice of "clearly established" law at a

"high level of generality" was short-lived:

> The most drastic change . . . in the Court's articulation of the qualified immunity
> standard came in *Ashcroft v. al-Kidd.* As Dean Erwin Chemerinsky has noted,

**SA 41**

prior to *al-Kidd* the standard had always "focused on whether it was clearly established law that 'a' reasonable officer should know" that the action at issue violated federal law . . . [Justice Scalia] inserted the word "every" in place of the word "a," so that the new rule of law became that a right is clearly established when "'[t]he contours of [a] right [are] sufficiently clear' that *every* 'reasonable official would have understood that what he is doing violates that right.'" The Court also added in that case that for law to be clearly established, "existing precedent must have placed the statutory or constitutional question *beyond debate*." In sum, the Court explained that when its new qualified immunity standard is "properly applied, it protects 'all but the *plainly incompetent* or those who knowingly violate the law.'"

Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113

Mich. L. Rev. 1219, 1247–48 (2015) (internal citations omitted).

If courts, as instructed in *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), decline to

address constitutional issues by looking first to qualified immunity, and are instructed to rely on

"existing precedent . . . [established] beyond debate," government officials and officers may

continue to operate in clear violation of constitutional standards without advise of what is

constitutional and without fear of redress, because the law will continue to protect "all but the

plainly incompetent." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

IV.  Application of Law to Facts

A.  Unlawful Entry of a Home

A jury will decide whether the officers' warrantless entry of plaintiff's home was

justified by exigency.

Officers responded to the scene to investigate a report of child abuse. They were

informed by EMTs that the 911 caller, who they believed might be intellectually challenged, had

met them outside, and taken them into the apartment. The caller did not state that the abuse was

ongoing; only that she had seen red marks on the baby.

Defendants requested entry to the apartment to investigate the alleged abuse. Plaintiff, who officers believed was the alleged perpetrator of child abuse, demanded that police produce a warrant to enter his home. This was plaintiff's constitutional right. *See Kentucky v. King*, 563 U.S. 452, 469–70 (2011). Police entry, however, may have been justified by the need to prevent ongoing harm to the baby or provide immediate aid before a warrant could be obtained. *See, e.g., Brigham City, Utah v. Stuart*, 547 U.S. 398, 406 (2006) (finding entry to a home was justified by exigency where officers responded to a loud house party at three a.m. and observed through a window a fight in the kitchen that had drawn blood); *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) ("It does not meet the needs of law enforcement or the demands of public safety to require officers to walk away from a situation like the one they encountered here. Only when an apparent threat has become an actual harm can officers rule out innocuous explanations for ominous circumstances. But [t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.") (internal citation omitted).

The court declines to apply qualified immunity. Case precedent and policy rationale fail to justify an expansive regime of immunity that would prevent plaintiff from proving a serious constitutional violation. *See* Michael Silverstein, *Rebalancing Harlow: A New Approach to Qualified Immunity in the Fourth Amendment*, 68 Case W. Res. L. Rev. 495, 522 (2017) ("The less clear the law is, the more beneficial it might be to allow the case to proceed to trial and resolve the case on the merits.").

## B. Unlawful Arrest

The probable cause to arrest Thompson for obstructing governmental administration rests on whether defendants had lawful reason to enter his apartment. This claim raises an issue of material fact that will be resolved at trial.

New York Penal Law Section 195.05 states:

A person is guilty of obstructing governmental administration when he intentionally obstructs, *impairs or perverts the administration of law or other governmental function* or *prevents or attempts to prevent a public servant from performing an official function,* by means of intimidation, *physical force* or interference, or by means of any independently unlawful act, or by means of interfering . . .

NYPL 195.05 (emphasis added).

Officers must be engaged in lawful conduct to arrest a defendant for obstruction. *People v. Sumter,* 151 A.D.3d 556, 557 (N.Y. App. Div. 2017) ("[A] defendant may not be convicted of obstructing governmental administration or interfering with an officer in the performance of an official function unless it is established that the police were engaged in authorized conduct."). If they were not lawfully able to enter the home, then plaintiff committed no crime by obstructing their path. *See Lennon*, 66 F.3d 416, 424 (2d Cir. 1995) (finding probable cause to arrest a woman for obstructing governmental administration who refused to comply with a lawful police order to exit her vehicle). If the obstruction arrest lacked probable cause, then the resisting arrest charge was also improper. *People v. Alejandro*, 70 N.Y.2d 133, 135 (1987) ("It is an essential element of the crime of resisting arrest that the arrest be authorized and, absent proof that the arresting officer had a warrant or probable cause to arrest defendant for commission of some offense, a conviction cannot stand.").

C. Malicious Prosecution

Plaintiff's claim for malicious prosecution shall proceed against Officer Clark. *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("[F]iling of the Criminal Court Complaint 'initiate[s]' the prosecution."). Probable cause is at issue for both criminal charges. *Wilson v. McMullen*, No. 07-CV-948 SLT LB, 2010 WL 1268055, at *6 (E.D.N.Y. Mar. 30, 2010) (finding malice may be inferred from a lack of probable cause). Plaintiff was deprived of his

26

liberty when he was held in jail for two days and then required to make several court appearances before his case was dismissed. *Evans v. City of New York*, No. 12-CV-5341 MKB, 2015 WL 1345374, at *6 (E.D.N.Y. Mar. 25, 2015) ("[C]ourts have found the deprivation of liberty element satisfied particularly where a criminal defendant was required to attend several post-arraignment court appearances, and/or where, as in New York, a defendant's release on his own recognizance requires the defendant to 'render himself at all times amenable to the orders and processes of the court.'") (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215-16 (2d Cir. 2000)).

### D. Denial of Right to Fair Trial

Defendants claim plaintiff resisted when officers attempted to place him under arrest for obstruction of governmental administration. Plaintiff argues that defendants fabricated evidence when they informed the District Attorney that he "began to flail" his arms "preventing the [officer] from placing handcuffs on the [plaintiff]." *See* Pls.' Summ. J., Ex. A, Crim. Ct. Compl.

The allegation that plaintiff flailed his arms preventing arrest was forwarded to the prosecutor by Officer Clark, placed in the criminal court complaint, used as the basis for charging him with resisting arrest, and served to deprive him of his liberty. Veracity assessment by the jury will decide this issue.

### E. Spoliation

Plaintiff's spoliation claim is denied. He argues it was reasonably foreseeable that civil litigation would arise from this prosecution and that the police department had an obligation to preserve the 911 call.

This may be true if there was evidence that the officers had actually heard the 911 call. They did not. The officers testified that they received only a "radio run" from an NYPD

27

dispatcher. The "radio run" is a description of the 911 call given from a dispatcher, not the 911 call, or a transcript of the call itself. Because the defendants never actually heard the 911 call it is not relevant to their state of mind at the time they approached the apartment. What may be decisive evidence is the I/Net Dispatcher Event Chronology ("Sprint Report") which was produced to plaintiff in discovery.

      F.  Officer Bertram's and Rodney's Personal Involvement

Plaintiffs does not contest Officer Rodney's non-involvement. He is dismissed from the case.

Sergeant Bertram is also dismissed. Bertram arrived at the scene after plaintiff was in custody and never entered the apartment building. Defs.' 56.1 at ¶ 24. Bertram, while unsure if the arrest was constitutional, called the NYPD legal bureau, and spoke to an attorney who confirmed that the arrest was proper. *See* Pls.' Summ. J., Ex. K, Bertram Dep. 33:12-35:4. He was not present when the alleged excessive force was used. *Id.* He had no reason to believe the arrest was unconstitutional.

V.  Conclusion

Plaintiff's motion for summary judgment is denied. Defendants' motion for summary judgment is granted in part.

Based upon observations of all parties at summary judgment proceedings, race was not an explicit factor in this controversy.

Trial shall be held on December 10, 2018, in courtroom 10B South at 2:00 p.m. A jury will be selected that morning by a magistrate judge. An *in limine* hearing will be held on December 3, 2018, at 10:30 a.m. The parties shall exchange and file with the court by November 26, 2018, the following: (1) motions *in limine*; (2) lists of pre-marked exhibits

proposed for use at the trial, together with copies of the exhibits and stipulations regarding

admissibility and authenticity; (3) lists of proposed witnesses together with brief summaries of

their proposed testimony; and (4) stipulations with respect to undisputed facts.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: June 26, 2018
       Brooklyn, New York

**SA 47**

**U.S. Constitution, Fourth Amendment – Searches and Seizures; Warrants**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**New York Penal Law § 195.05 – Obstructing Governmental Administration in the Second Degree**

A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act, or by means of interfering, whether or not physical force is involved, with radio, telephone, television or other telecommunications systems owned or operated by the state, or a county, city, town, village, fire district or emergency medical service or by means of releasing a dangerous animal under circumstances evincing the actor's intent that the animal obstruct governmental administration.

**SA 48**

**New York Penal Law § 205.30 – Resisting Arrest**

A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person.

**New York Criminal Procedure Law § 690.50 – Search Warrants; Execution Thereof**

1.     In executing a search warrant directing a search of premises or a vehicle, a police officer must, except as provided in subdivision two, give, or make reasonable effort to give, notice of his authority and purpose to an occupant thereof before entry and show him the warrant or a copy thereof upon request. If he is not thereafter admitted, he may forcibly enter such premises or vehicle and may use against any person resisting his entry or search thereof as much physical force, other than deadly physical force, as is necessary to execute the warrant; and he may use deadly physical force if he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force. . . .